1

1

2

3

4          UNITED STATES DISTRICT COURT

5          CENTRAL DISTRICT OF CALIFORNIA

6              SOUTHERN DIVISION

7                  – – –

8     THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

10        ROBERT NIGG, et al.,
                  Plaintiffs,
11          vs.

12                              SACV-03-01611-JVS
        UNITED STATES POSTAL
13        SERVICE, et al.,
                  Defendants.

14        ---------------------------

15

16

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18            Santa Ana, California

19             January 12, 2012

20

21

22            SHARON A. SEFFENS, RPR
              United States Courthouse
23            411 West 4th Street, Suite 1-1053
              Santa Ana, CA  92701
24            (714) 543-0870

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiffs:

 3    DANIEL A. OSBORN
      LINDSAY M. TRUST
 4    OSBORN LAW, P.C.
      295 Madison Avenue, 39th Floor
 5    New York, NY  10017
      (212) 725-9800
 6

 7    JOHN J. BEINS
      BEINS, GOLDBERG & HENNESSEY, LLP
 8    Chevy Chase Metro Building
      2 Wisconsin Circle, Suite 700
 9    Chevy Chase, MD  20815
      (240) 235-5040
10

11    For the Defendant:

12    ANDRE BIROTTE, JR.
      United States Attorney
13    LEON W. WEIDMAN
      Assistant United States Attorney
14    Chief, Civil Division
      JASON K. AXE
15    Assistant United States Attorney
      JOANNA HULL
16    Assistant United States Attorney
      Federal Building, Suite 7516
17    300 North Los Angeles Street
      Los Angeles, CA  90012
18    (213) 894-8827/6585

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 12, 2012; 8:30 A.M.

2       THE CLERK:  Item No. 2, SACV-03-01611-JVS, Robert

3  Nigg, et al, versus the U.S. Postal Service, et al.

4       Counsel, please state your appearances for the

5  record.

6       MR. OSBORN:  Good morning, Your Honor.  Daniel

7  Osborn along with John Beins and Lindsay Trust for the

8  plaintiffs.  With us is Inspector Nigg and Inspector Lewis.

9       MR. AXE:  Good morning, Your Honor.  Assistant

10  United States Attorney Jason Axe, and with me is Joanna

11  Hull, Lawrence Katz, and Kristen Lee.

12       THE COURT:  Good morning.

13       How are we going to proceed this morning?

14       MR. AXE:  We will waive further calling of

15  Mr. Miskanic.  We are willing to proceed directly into

16  closing arguments.

17       THE COURT:  Did you let Mr. Osborn know last

18  night?

19       MR. AXE:  I'm sorry.  I did not.  I apologize.

20       THE COURT:  Mr. Osborn.

21       MR. OSBORN:  Well, Your Honor, it is what it is.

22  We are ready to proceed.

23       THE COURT:  Okay.  Very good.

24       MR. OSBORN:  I have a question for the Court about

25  the sequence of the closings this morning.  Again, we have

```
 1    this nuance because the administrative exemption is an
 2    affirmative defense.  I would propose the following, that I
 3    go first anyway.  I will go first.  I will address the
 4    administrative exemption.  I would like to reserve a couple
 5    of minutes to rebut any comments that Mr. Axe has, and then
 6    Mr. Beins will address the good-faith defense after that.
 7             THE COURT:  That's fine.  Are you ready to
 8    proceed?
 9             MR. OSBORN:  Yes, Your Honor.  I didn't know if
10    the Court had set one hour for this.
11             THE COURT:  Well, you indicated about an hour.
12    That's fine.  If I think I have a point, I'll tell you.
13             MR. OSBORN:  Very well.
14             MR. AXE:  There are some administrative issues on
15    the exhibit list.  I think we have come to an agreement with
16    respect to the exhibits.  The clerk had given us a copy of
17    the tracking of the exhibits that have been done --
18             THE COURT:  Well, you stipulated yesterday that
19    all the exhibits would come in except the deposition
20    transcripts.
21             MR. AXE:  Correct.  In further clarification, the
22    plaintiffs and Ms. Tunis showed me the amended exhibit list
23    that was submitted which had those stricken.  I just wanted
24    to know procedurally do we need to do anything further with
25    respect to providing you with the lists prior to the closing
```

```
 1  arguments?
 2          THE COURT:  As long as the clerk has a full
 3  list --
 4          MR. AXE:  I have the additional page that had the
 5  additional USPS exhibits.  If I could give that back to her.
 6          THE COURT:  Okay.  That's fine.
 7          Would it be fair to say that the plaintiffs' prima
 8  facie case for a claim of overtime under the Fair Labor
 9  Standards Act is undisputed?  They are employees.  They work
10  more than 40 hours per pay period.  They didn't get paid
11  time and a half.  Is there any dispute as to that at all?
12          MR. OSBORN:  Your Honor, I don't believe so.  I
13  have dedicated a grand total of two lines in our notes to
14  that in my remarks and was going to -- one of them is that I
15  think it's unrebutted.
16          THE COURT:  Okay.
17          MR. OSBORN:  I'll formally incorporate that into
18  the closing since it's so short.
19          THE COURT:  That's fine.
20          MR. OSBORN:  I'm sorry.  I was remiss, Your Honor.
21  Given the circumstances of a bench trial -- we're obviously
22  doing our closings now.  We would also like to incorporate
23  into our closings a Rule 52(c) motion with respect to the
24  administrative exemption.  It's our position that the
25  government has not demonstrated that the postal inspectors
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

6

1  qualify for the administrative exemption.  And I will simply

2  cover those points as I go through the closing with the

3  Court's permission.

4         THE COURT:  Given that all the evidence is in, is

5  the standard any different in terms of a Rule 52(c) motion

6  or me simply deciding this as the finder of fact?

7         MR. OSBORN:  I don't think the standard is

8  different.  You are going to hear my closing remarks -- a

9  number of references -- quite a few references to the law,

10  not just our representations about the factual evidence that

11  came in.

12         THE COURT:  Okay.

13         MR. OSBORN:  Good morning again, Your Honor.  As I

14  indicated, my remarks will address the administrative

15  exemption, and Mr. Beins will address the good-faith defense

16  that's been asserted by the Postal Service.

17         As the Court noted last Friday after just a day or

18  half a day of evidence, the operative facts haven't changed

19  much since the summary judgment motions were filed in this

20  case.  For example, with respect to a number of the law

21  enforcement activities performed by inspectors -- I think

22  the parties would agree that they are done -- the disputes,

23  among others, are whether the activities are office or

24  non-office, manual or nonmanual, whether the frequency of

25  the activity has any bearing on the case.  That seemed to be

1  the Court's sentiment last Friday, and I think the

2  plaintiffs are also of the view that what's left is really a

3  question of law at this juncture.

4          So as I noted a moment ago, I am not going to

5  spend a lot of time presenting facts or evidence

6  necessarily.  The Court has the declarations.  At this

7  juncture, the remaining question is whether postal

8  inspectors are entitled to FLSA overtime, or are they

9  administratively exempt and thus not entitled to FLSA

10  overtime?

11          With respect to the prima facie case that Your

12  Honor noted a moment ago, the evidence did show that postal

13  inspectors are entitled to FLSA overtime.  They are

14  expressly included within the text of the Fair Labor

15  Standards Act.  That was testified to by Mr. Wiley.  The

16  inspectors have worked more than 40 hours per week.  That

17  evidence was contained in the declarations of the level 13

18  inspectors who testified in this case:  Inspectors Stern

19  Marchese, Nigg, Finney, and Brooks.  Finally, the evidence

20  is unrebutted that all of these inspectors have not been

21  paid time and a half for the hours that they worked beyond

22  40 hours per week.  That's our case-in-chief, and the

23  plaintiffs would submit that they are entitled to judgment

24  on that claim.

25          The Postal Service of course claims that postal

1    inspectors are exempt from Fair Labor Standards Act overtime

2    as administrative employees.  The Postal Service of course

3    has the burden of proof on this point.  It's not just a

4    preponderance of the evidence.  The cases suggest that it's

5    actually quite a bit more than that.  Reading from Bothell

6    versus Phase Metrics, a Ninth Circuit case, 299 F. 3rd at

7    1120, it says:  "Because the FLSA is to be liberally

8    construed to apply to the furthest reaches consistent with

9    congressional direction, FLSA exemptions are to be narrowly

10   construed against employers and are to be withheld except as

11   to persons plainly and unmistakably within their terms and

12   spirits."  We would submit, Your Honor, that that's a very

13   high burden.  Exemptions are not to be granted freely.

14           Before we get to the exemption analysis, the

15   regulations contained at 29 CFR 541 through 541-710 provide

16   a lot of guidance and instruction for the parties, as well

17   as the Court.  Before you get into the traditional

18   administrative analysis -- administrative exemption

19   analysis, there's a statute -- one of the regulations,

20   541.3(b)(1), if it's satisfied would allow the parties or

21   the Court to forego any further analysis and to forego the

22   primary duty analysis that is ordinarily conducted in

23   connection with the administrative exemption.  So before you

24   ever get to the two-part test that I am going to talk about

25   in a moment, you look at the scope of the exemptions.

1           Your Honor has already ruled that 541.3(b)(1) does

2    not apply because the work of inspectors is tied to the

3    business operations of the Postal Service.  But, again, I

4    would like to offer the Court so we have a full record for

5    any appeal about 541.3(b)(1).  The plaintiffs submit that

6    541.3(b)(1) is unambiguous.  It's plain on its face.  If you

7    perform the tasks that are identified within 541.3(b)(1),

8    you're carved out from the exemption.  That is, you are

9    entitled to FLSA overtime.

10          You have heard testimony from our witnesses and

11   from the government's witnesses as to whether or not the

12   inspectors perform the tasks that are identified in

13   541.3(b)(1).  I think the testimony is uniform and unanimous

14   that level 13 inspectors do prevent or detect crimes.  They

15   conduct investigations.  They perform surveillance.  They

16   pursue, apprehend, and restrain suspects.  They detain

17   suspected criminals.  They interview witnesses.  They

18   interrogate and fingerprint suspects, and they prepare

19   investigative reports.

20          Again, we understand the Court has already ruled.

21   We would ask that the Court look at this issue one more

22   time, particularly in light of some of the cases and DOL

23   letters that the Court has.  We filed a couple more last

24   night.  If you look at the Murphy and Rooney case in

25   particular, both the Murphy and Rooney cases are related to

1  basically fights over the applicability of 541.3 to

2  sergeants and lieutenants.  Basically what is happening is

3  Courts across the country are trying to figure out what this

4  541.3(b)(1) means.  Some Courts are -- they are not

5  struggling with it at all.  They find it as a bright line

6  between, for example, sergeants and lieutenants.  Some of

7  the Courts have found, for example, that detectives qualify.

8  There is a question about whether sergeants and lieutenants

9  qualify.

10         Some of the Courts perform a primary duty analysis

11  to determine whether or not a particular position is doing

12  the tasks identified in 541.3.  But for the most part, when

13  a Court determines that the work that's identified or the

14  tasks that are identified in 541.3(b)(1) are being

15  performed, that ends the analysis.  I think that was a

16  question that you had asked me during the summary judgment

17  hearing a couple of months ago.  If I find that 541.3(b)(1)

18  applies, do I have to do anything else?  It's plaintiffs'

19  position that you don't, Your Honor.

20         Now, in the event that you find that 541.3(b)(1)

21  does not apply, then we do jump into the traditional

22  two-part test for the administrative exemption.  That's

23  found at 29 CFR 541.200(a).  I will just go through the two

24  parts independently.

25         The first question or the first part of the test

1    is:  Is the employee's primary duty the performance of

2    office nonmanual work directly related to the management or

3    general business operations of the employer or its

4    customers?"  That's 29 CFR 541.200(a)(2).

5          The Court has already ruled that the inspector's

6    work is related to the general business operations.  We

7    believe we have objected to that ruling on the record.  If

8    not, I would make the objection now.

9          THE COURT:  Well, it's preserved in the summary

10   judgment ruling.

11         MR. OSBORN:  Very well.

12         One distinction that the Court drew that we don't

13   believe is a viable distinction -- I think Your Honor noted

14   that the -- you tied the work of the postal inspectors to

15   the general business operations and said that you weren't

16   really addressing the management issue.  It's plaintiffs'

17   position that really there is no distinction.  That phrase

18   is to be read all together.  It's management or general

19   business operations with the concept being are they

20   participating in the running of the business generally?  We

21   have obviously argued that they don't.

22         I would invite the Court now that the evidence is

23   in to look back at the MSPB proceedings involving Mr. Nigg

24   for evidence of -- it goes back to the judicial estoppel

25   argument, Your Honor.  Effectively, the Postal Service has

1    argued and won on a number of occasions that level 13

2    inspectors are not management.  We think that's still a

3    significant position, again, recognizing the distinction

4    that the Court drew between management and general business

5    operations.  We would invite the Court again to revisit that

6    particular issue, consider the MSPB determinations where the

7    MSPB has come out very flatly and directly and stated level

8    13 inspectors are not management.  They don't make decisions

9    affecting the management or running of the business.

10           I am going to get into the discretion point in

11   just a few minutes, but those cases are also instructive on

12   the discretion point because they say that inspectors don't

13   exercise a sufficient level of discretion that would qualify

14   them as management and therefore entitled to certain MSPB

15   appeal rights.  So I just bring that to the Court's

16   attention as well.

17           The remaining dispute then is whether the postal

18   inspector's primary duty involves office nonmanual work or,

19   conversely, non-office manual work.  Again, the Postal

20   Service has the burden of showing that level 13 postal

21   inspectors have an office job.  They have shown that

22   inspectors have an office -- we don't dispute that -- that

23   they have a phone -- we don't dispute that -- that they have

24   a computer.  Fine.  But I think Your Honor can deduce that

25   you can't arrest somebody sitting in your office.  So all of

13

1   that preparatory work -- it's nice to have the office, but

2   the front-line law enforcement work is done on the streets

3   when people are being arrested.  If you look at any of the

4   annual reports submitted by the Postal Service in this case,

5   you will see -- and I am going to talk about it in a moment

6   -- that they promote the front-line law enforcement work

7   that these folks do, not the office work.

8          What does it mean to have office nonmanual primary

9   duty?  Well, the regulations are not very helpful.  They

10  provide a lot of guidance in some areas and not so much in

11  others.  This is one where there is really no definition or

12  description of office nonmanual work in the regulations.

13  The 1992 Adam decision used the dictionary meaning of

14  "manual."  What's the opposite of office?  What means

15  non-office?  They used the dictionary definition meaning

16  "requiring or using physical skill or energy."

17         That phrase or terminology was adopted in the

18  preamble to the regulations.  I will draw the Court's

19  attention to page 22130 of the preamble.  It was also used

20  by the Rooney Court.  That's why we have been focusing -- we

21  focused in our declarations and we focused on the testimony

22  that we elicited on the physical nature of the inspector's

23  work.

24         That approach is consistent with the Court's

25  ruling in Rooney.  I am sure the Court is familiar with

1    Rooney involving U.S. deputy marshals.  Those folks were

2    deemed entitled to FLSA overtime because their position

3    required physical strength and stamina to perform such

4    activities as long periods of surveillance, repursuing and

5    restraining suspecting, carrying heavy equipment, and being

6    subject to physical attack by lethal weapons.those folks

7    were found to be non-office workers.

8           Let's look at the physical aspect of the

9    inspector's work.  The plaintiffs testified -- and I believe

10   each of the defendants' witnesses who testified on

11   particular topics agreed that level 13 inspectors carry a

12   weapon, serve and execute search warrants.  By the way, this

13   is not just the 541.3 list, which I'm sure the Court has

14   indelibly inscribed in its mind.  There are a few more here.

15   The physical nature of the inspector's work is evidenced by

16   the fact that they carry a weapon.  They serve and execute

17   search warrants.  They prevent and detect crime.  They

18   perform surveillance.  They pursue, restrain, and apprehend

19   suspects.  They detain suspected criminals.  They interview

20   witnesses.  They interrogate suspects.  They fingerprint

21   suspects.  They make arrests.

22          Your Honor, the testimony from the inspectors who

23   testified -- the testimony from the inspectors who were

24   called to testify here testified that they spent most of

25   their time out of the office, not just sitting there in the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   office.  Now, of course, that changed over time, and then it

2   changed a little bit depending on your assignment, but for

3   the most part, these folks all testified that they spent

4   most of their time out of the office during most of their

5   careers.

6          THE COURT:  But don't we have testimony from

7   various level 14s that the amount of time in the office was

8   anywhere from 50 to 80 percent?  Isn't it fair to say that

9   it is somewhat of a moving target depending on the

10  particular assignment, the particular matter, level 13s

11  pursuing a particular stage of an investigation?

12         MR. OSBORN:  Yes, it is something of a moving

13  target.  I would submit, though, that you don't look at a

14  mathematical percentage -- or you don't look at a percentage

15  to determine whether or not it's an office job.  These folks

16  are front-line law enforcement.  Yes, on occasion, they

17  spend more time in the office than not in the office, but

18  it's all for the purpose of conducting front-line law

19  enforcement, making arrests, catching the criminals,

20  catching the bad guys and putting them away.  Again, you

21  can't do that in your office.  So if somebody spends a

22  little bit more time in the office than not in the office,

23  that's not dispositive, Your Honor.  I think you will give

24  the appropriate weight to that, but that's not the test.

25         THE COURT:  Would you agree that with respect to

1    the general analysis my job is to sort of take a step back

2    and look at all these little individual pieces and make an

3    overall judgment on each of these factors such as the time

4    in the office, the degree to which discretion is exercised,

5    the degree to which independent judgment is exercised?

6              MR. OSBORN:  Sure.

7              THE COURT:  Would you not agree that the evidence

8    is quite varied on those issues depending on the individual

9    who testified, what his assignment was at the time, who his

10   supervisor was?

11             MR. OSBORN:  If you are simply talking about the

12   frequency of an event, yes, the testimony varied.  But,

13   again, that's not the test, and that's only one component.

14             THE COURT:  Well, isn't the test according to the

15   regs to be fact based on what people actually do?

16             MR. OSBORN:  Yes, under the FLSA, you look at the

17   actual duties performed.  Let me take, for example, the

18   example of a fireman.  I think everyone in this room would

19   agree that the firefighter position is particularly physical

20   in nature, but that firefighters aren't out on the street

21   every day fighting fires.  They could go days or weeks or in

22   some small towns probably months without actually getting a

23   call on an emergency or a fire.  That doesn't make their

24   position any more of an office position than it does with a

25   postal inspector.

17

```
 1              THE COURT:  But firefighters don't have offices.
 2    I don't believe we have evidence of firefighters in the
 3    record, so --
 4              MR. OSBORN:  I'm just using that as an analogy to
 5    show that -- you know, you don't just focus on the time, and
 6    you don't just focus on the frequency.  That's not what the
 7    regulations say.  In fact, there is a regulation that says
 8    let's look at the amount of time they spend doing non-exempt
 9    or exempt work.  That's helpful.  It provides guidance, but
10    it is not dispositive.  Again, I think we can't forget that
11    these people are doing front-line work.  They are not desk
12    jockeys.
13              THE COURT:  Do you have to be a desk jockey to for
14    the exemption?
15              MR. OSBORN:  You have to have an office job.  They
16    may go to the office, but it's not an office job.  It's not
17    promoted to them -- or it's not advertised to them as an
18    office job.
19              One of the things that I was going to talk
20    about -- I will just fast-forward a little bit.  If you look
21    at Exhibit 241, it's the U.S. Postal Inspection Service
22    Annual Report for the year 2010.  It's 90 pages long.  You
23    won't find a picture of a postal inspector sitting at a desk
24    in here.  You will find that the Postal Inspection Service
25    is promoting to whoever is reading this in a report the
```

```
 1    physical non-office nature of the position.  At page 18,
 2    there is a picture of handcuffs.  At page 23, there is an
 3    inspector standing over a substantial amount of it looks
 4    like confiscated weapons.  At page 26, there is a photograph
 5    of a couple of postal inspectors.  It look likes they are
 6    confiscating marijuana or some other form of contraband.  At
 7    page 28, there is a postal inspector doing surveying of some
 8    mail.  Page 63 shows an inspector with some folks down in
 9    Haiti and describes the national liaison work that the
10    Postal Inspection Service does.  On pages 72 and 77 of the
11    2000 Annual Report, there is a picture of somebody at a
12    shooting range, a firing range.
13            So they may come in here now and tell you this is
14    an office job.  You heard the inspectors say it's not an
15    office job.  Their job is to fight crime.  That's what they
16    do.  It may not be that they are arresting somebody every
17    day, but that's what they are trained to do, and that's what
18    their job position is advertised as.  You don't see 90 pages
19    of, hey, come sit in an office, do some data mining on a
20    computer, do some other searches of databases, hang out with
21    the guys, talk about ways we might catch these guys.  That's
22    not what they are promoting.  They are promoting frontline
23    out-of-the-office activities.
24            Your Honor, that segways into another point I
25    would like to make, which is if it's an office job, why is
```

1   there such an emphasis on the medical condition of the

2   inspectors and the physical requirements of the job?

3           There were a couple of exhibits that were

4   introduced -- plaintiff's Exhibit 38, Your Honor, under

5   requirements for U.S. postal inspectors.  Again this is in

6   evidence as Exhibit 38.  Part of the job application for

7   postal inspectors says:  It is essential that inspectors be

8   in sound physical condition and be capable of performing

9   vigorous physical activities on a sustained basis.  It goes

10  on that they have to be capable of exerting physical force

11  in the arrest, search, pursuit, and restraint of another

12  person; and that they have to be able to protect themselves

13  and others from imminent danger.

14          THE COURT:  Is a physical job necessarily a manual

15  job?

16          MR. OSBORN:  Is physical necessarily manual?  Yes.

17  We equate the two, and I think the Rooney decision does as

18  well, Your Honor.  Again, the regulations don't give us a

19  lot of guidance, but the Rooney decision says this is what

20  it means to be non-office.  It means to --

21          THE COURT:  No.  No.  I am focusing on the manual

22  part of the analysis, non-office manual.  Is any kind of

23  physical exertion manual?

24          MR. OSBORN:  I think you have to look again at the

25  primary duty of the --

1          THE COURT:  Just look at the task.  I think we

2    would agree if someone sat on an assembly line and screwed

3    on the same part on an assembly hour after hour, that would

4    be manual.  That's not the type of exercise of the body that

5    inspectors engage in, so does manual mean any physical

6    exercise?

7          MR. OSBORN:  Not any.  I think you have to look at

8    it, Your Honor, and determine.  I mean, if you're looking at

9    the person on the production line, that's manual.  It's

10   physical.  That person is probably going to be exempt if

11   they are doing repetitive actions with their hands.

12         THE COURT:  Well, they are probably not exercising

13   discretion or independent judgment either but just focusing

14   on that one aspect.

15         MR. OSBORN:  I'm sorry.  I just want to make sure.

16   You're asking me is manual equal to --

17         THE COURT:  Coextensive with physical -- because

18   the word in the regs is manual, not physical.

19         MR. OSBORN:  Right.  And unfortunately we have to

20   look for a little guidance there, and there is no definition

21   of what manual means in the regs.  There is some language

22   about -- 541 is about repetitive stuff with your hands.  I

23   understand that.

24         THE COURT:  Right.

25         MR. OSBORN:  But that's only an example.  I don't

21

1   believe it captures the full import of what the FLSA is

2   trying to do.

3           THE COURT:  But would you agree that the kind of

4   manual exercise that postal inspectors engage in is not

5   repetitive?

6           MR. OSBORN:  Yes, I would.

7           THE COURT:  Okay.

8           MR. OSBORN:  One second, Your Honor.

9           (Plaintiff counsel conferring)

10          MR. OSBORN:  Your Honor, Mr. Beins has pointed out

11  to me that the Rooney decision isn't just some case we found

12  on Westlaw, but the Rooney decision is cited in the preamble

13  to the regulations, and it's cited for the purpose of giving

14  us guidance as to what manual means.

15          Again, it borrowed from Adam using the dictionary

16  definition of manual as requiring or using physical skill

17  and energy.  So it doesn't use the phrase repetitive -- I

18  forget what the other magic words are, but it gives us other

19  guidance in terms of what office nonmanual is and it

20  describes it as the requiring or using physical skill and

21  energy.

22          So in that sense, yes, what the inspectors do is

23  manual.  It may not be repetitive motions with their hands,

24  but it's clearly manual.  We would therefore, you know,

25  equate physical to manual, and that's the basis of our

22

```
 1    argument that they are not exempt.
 2              There is a manual component to their work, of
 3    course.  Focusing again on plaintiff's Exhibit 38 -- it's
 4    the defendant's documents, their job application -- it
 5    requires that inspectors be proficient with firearms, have
 6    skills in self-defense.  That's another physical manual
 7    component to their job.
 8              In fact, inspectors have to requalify in their
 9    firearms training twice a year, and they have to go through
10    defensive tactics each year.  That doesn't sound like much
11    of an office job to me.  Those tasks have a physical
12    component to them.
13              THE COURT:  What if you exercise the physical
14    component in a context where you are doing so in the
15    exercise of discretion and independent judgment?  If you are
16    exercising the physical component in that manner, can the
17    activity fairly be said to be manual?
18              MR. OSBORN:  I am trying to process the example in
19    my head of what you described.  If an inspector is
20    performing his duty, exercising discretion and
21    judgment using that duty --
22              THE COURT:  Well, suppose he goes out to make an
23    arrest and he makes a judgment as to when he is going to
24    arrest, what tactics he is going to employ for the arrest,
25    who he is going to take with him, and he's the one who makes
```

23

```
 1    some concrete judgments about that that are within his
 2    discretion as to how to make an arrest.  He makes those
 3    judgments and then he goes out and physically arrests
 4    somebody, and he has to chase them.  If in the exercise of
 5    the physical component he is exercising discretion or
 6    independent judgment, is that physical component manual?
 7            MR. OSBORN:  I know I told you Mr. Beins was going
 8    to talk after me, but he is anxious to give me a piece of
 9    information, Your Honor.
10            THE COURT:  That's fine.
11            (Plaintiff counsel conferring.)
12            MR. OSBORN:  Thank you for indulging me.  I think
13    what you have described, as Mr. Beins has pointed out to me,
14    is the Mullins case which the Court may be familiar with.
15    That was drawing distinction between sergeants and
16    lieutenants and focusing on the sergeants.
17            There was a question about whether or not if the
18    sergeants are doing frontline law enforcement and they might
19    also be performing some level of management work, whether
20    those folks were nonexempt and entitled to overtime.  The
21    Court found that they were.  So I think using your example
22    with an inspector out on an arrest, exercising some degree
23    of discretion as to conducting that arrest, that's not going
24    to make him exempt.  He would be still be deemed
25    nonexempt -- if I'm answering the Court's question.
```

24

 1          THE COURT:  Well, your position is that even if he

 2   exercises discretion, that that work is manual.

 3          MR. OSBORN:  Yes.

 4          THE COURT:  Okay.

 5          MR. OSBORN:  Again, Your Honor, with respect to

 6   the physical nature of the inspector's position, I would

 7   just draw the Court's attention back to Exhibit 272, which

 8   was a Postal Inspection Service policy update that was dated

 9   October 23, 2002.  In that policy update the inspection

10   service is telling the -- I think this went into the

11   inspection service manual.  It became part of the inspection

12   service manual.

13          I'm just going to read a couple of pieces into it

14   so that the Court can, again, get the flavor.  Actually the

15   Court probably already has the flavor -- and if you'll

16   indulge me for a moment.  But 272 says:  All applicants must

17   undergo an applicant medical suitability examination and be

18   medically suitable to perform the essential functions of the

19   position efficiently and without hazard to themselves and

20   others.  Failure to meet any one of the required medical

21   qualifications will be considered individually and may

22   result in disqualification for appointment.

23          It then goes on to describe some potentially

24   disqualifying medical conditions.  And without identifying

25   any specific condition, it says that any condition that

1    causes an unsatisfactory ability to pursue and apprehend

2    individuals, any health condition that causes an

3    unsatisfactory ability to safely and effectively combat,

4    restrain, or subdue individuals, any health condition that

5    causes an unsatisfactory ability to perform surveillance for

6    long or extended hours in an extreme environmental

7    conditions.  It goes on to identify a few more.

8            My point is, Your Honor, if you look at Exhibit

9    272 regarding the medical condition of postal inspectors, if

10   you look back at Exhibit 38 with respect to the job

11   application, if you look back at Exhibit 241, which is the

12   annual report, again those documents, they have meaning.

13   And the meaning that is in those documents is that this is a

14   physical frontline law enforcement position.  They are

15   required to be in good health.  They are required to be in

16   good shape.

17           If you put all those together, plus the rest of

18   the testimony that you have heard from the inspectors, you

19   clearly get the picture that these folks are doing a

20   non-office manual position.  I think it's a bit disingenuous

21   for the Postal Service to come in here at this date for

22   purposes of the case and sort of dismiss the significance of

23   their own documents and the job descriptions or the

24   requirements that are contained within those documents.

25           Again, the Postal Service has the burden on that

26

1   particular issue, and it's our view that they have not

2   carried that burden and they haven't shown that the

3   inspectors are office workers.  Therefore inspectors are

4   entitled to judgment on that issue.

5           Let me just touch briefly on the second prong of

6   the test.  Again, I know the Court is familiar with all

7   this.  I'll try to be brief.  The second prong of the

8   administrative exemption analysis, 541.200(a)(3), the

9   question there is:  Does the employee's primary duty include

10  the exercise of discretion and independent judgment with

11  respect to matters of significance?

12          I think generally what happens is in these

13  inquiries that test gets broken down into two parts.  You

14  look at the discretion and independent judgment and then

15  determine whether or not it relates to matters of

16  significance.  Again, I don't think, Your Honor, the facts

17  are really in dispute.

18          THE COURT:  I agree with that.  By and large none

19  of the facts are in dispute here.  You know, it's the

20  conclusions you draw from the facts.

21          MR. OSBORN:  Correct, Your Honor.

22          THE COURT:  There are variations in the facts.

23  There is a spectrum of how much time people spend in the

24  office.  There is a spectrum of discretion depending on who

25  the supervisor is.  But by and large the facts aren't really

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    in dispute.

2          MR. OSBORN:  Right.  And with respect to the facts

3    that are relevant to this inquiry, you know, are the

4    inspectors deciding the order of their interviews?  Are they

5    deciding whom to interview and when to interview?  Are they

6    deciding which questions to ask and what leads to follow?

7    Are they deciding when to conduct a search warrant, which

8    investigative techniques to utilize?  Are they preparing

9    their operations plans?  And then the question is:  How does

10   that evidence line up against the regulations?

11         And 541.202(e) gives us some guidance, Your Honor.

12   This is in the context of the discretion and independent

13   judgment regulations in trying to give some guidance as to

14   what it means to be exercising discretion and independent

15   judgment.  E says the exercise of discretion and independent

16   judgment must be more than the use of skill in applying

17   well-established techniques, procedures, or specific

18   standards described in manuals or other sources.

19         Focusing on the skill in applying well-established

20   techniques, the inspectors have all testified that the

21   discretion and independent judgment that they perform is

22   really nothing more than exercising the training and

23   experience and skill that they have developed.

24         When I asked some of the Postal Service

25   representatives about whether or not these tasks involved

1  basically the application of skill, they all said yes.  I

2  know Your Honor asked a couple of questions yesterday about,

3  you know, what's the difference?

4           THE COURT:  No.  No.  Cannot one apply skill,

5  training, and experience with discretion?  The testimony I

6  heard yesterday said yes.

7           MR. OSBORN:  I think actually that's a question

8  for Your Honor to decide, and frankly I think the answer is

9  no.

10          THE COURT:  Well, I mean, there is a common

11  sense -- whether there is, quote, discretion within the

12  meaning of the statute or the regs is obviously a factual

13  legal conclusion for the Court to make.  But I certainly

14  have lay testimony to suggest that simply because one uses

15  skill, training, and experience, it doesn't exclude the

16  presence of discretion or independent judgment.

17          MR. OSBORN:  Well, I agree that was the testimony

18  you heard.  You know, the inspectors who testified said that

19  they're really not doing that.  They're simply -- they've

20  got all this training.  They go for 11 or 16 weeks,

21  depending on how long --

22          THE COURT:  But just because one has training, it

23  doesn't seem to me that that precludes the exercise of

24  discretion.

25          MR. OSBORN:  I think technically you are probably

```
 1   right.  But if you just apply that approach flatly to every

 2   person's job every time you make a decision, you would be

 3   deemed to be exercising discretion.  And I guess that maybe

 4   gets --

 5          THE COURT:  Well, isn't it the nature of the

 6   discretion?  I mean, if I am a trained plumber and I can use

 7   one of two types of wrenches to solve a plumbing problem,

 8   yeah, I have a choice.  I make an independent judgment.  But

 9   I don't think that that would rise to what one would call

10   discretion or independent judgment in the sense of the regs.

11          MR. OSBORN:  I would agree, Your Honor.  And to

12   some extent, to a large extent, the inspectors, they are

13   conducting criminal investigations.  And there is a -- I

14   won't say it's a formula, but there is a way to do that.

15   You investigate the crime scene.  You interview the

16   witnesses who may have evidence.  You decide what questions

17   to ask them, not just randomly but based on types of

18   questions that an inspector believes based on his training

19   and experience will elicit the information.

20          THE COURT:  But isn't it an interactive exercise?

21   I mean, the inspector goes out there and he gathers facts.

22   He doesn't have a set list of questions to ask.  Rather, he

23   figures out what are the areas that need inquiry, and then

24   he asks the questions -- unlike a census taker who goes out

25   and asks questions, but a census taker just reads the
```

questions.  They are not census takers; are they?

       MR. OSBORN:  Well, they are not, Your Honor.  I found it interesting that the -- well, I guess this is on the other issue.  I am just thinking that their own expert concluded that these folks were like claims adjustors, which relates more to the manual mature of their job.

       But, no, they are not census takers.  They are not simply repeating the same thing.  You heard testimony yesterday about the audit function where that is largely --

       THE COURT:  Right.

       MR. OSBORN:  But in the same vein, Your Honor, and maybe you and I are going to chase each other around the courtroom on this, because they are doing -- they know what questions to ask.  They know what to do based on the training that they get, which is extensive; the experience they develop during the course of their career; and then the skill that I think is sort of a combination of those two things or the result of those two things.

       So obviously it's our position that they are simply -- I don't mean to demean their work.  It's very important work.  But to a large extent investigation number 50 is based on what they did at investigation number 25, which is based on what they did in investigation number 1.  So they're learning what to do as they go along.

       You know, the testimony that you heard from our

1  folks was, hey, I'm just exercising my skill based on all

2  the training I got and the experience I developed over time.

3          THE COURT:  But isn't that true of anyone in any

4  job who stays in the job over time?  They will have skills;

5  they will have training; they will have experience.  And as

6  they become more seasoned, they will use that.  But does

7  that necessarily exclude the discretion and independent

8  judgment?

9          MR. OSBORN:  I think, Your Honor, that's why the

10 regs have the second part which is on matters of

11 significance.

12         THE COURT:  Okay.

13         MR. OSBORN:  That might help us figure this out,

14 but I think that's probably why that's added, because you're

15 right.  In every job in theory you are exercising discretion

16 and judgment.  In every job you're using your skill based on

17 your training and experience and the longevity for which you

18 have been at the position.  It only has meaning in terms of

19 the regs if the discretion is significant.

20         THE COURT:  Significant with respect to the

21 business.

22         MR. OSBORN:  I just want to look and see -- did

23 the actual language says an employee's primary duty must

24 include the exercise of discretion and independent judgment

25 with respect to matters of significance.

1              Now, when you -- the regs do give us guidance on

2      matters of significance, 541.202(b), and there is a laundry

3      list of examples of what is deemed to be significant.  The

4      reg says factors to consider when determining whether an

5      employee exercises discretion and independent judgment with

6      respect to matters of significance include but are not

7      limited to.  And it gives a whole host.

8              Let me just read a couple, because I think there

9      is testimony from the Postal Service that our folks do these

10     things:  Whether the employee has authority to formulate,

11     effect, interpret, or implement management policies or

12     operating practices.  The testimony from our folks is they

13     don't do that.

14             All of these, by the way, if you look at these, if

15     you look into 541.202(b), these have to do with really

16     running the company, running the business.  It's not just

17     whether it's important.  I mean, I think we would all agree

18     that --

19             THE COURT:  Isn't part of running the business

20     making sure it does run; namely, if it's supposed to collect

21     revenue, it does collect revenue?

22             MR. OSBORN:  I think, Your Honor, that's where we

23     sort of fundamentally disagree with your earlier decision in

24     this case that the work of inspectors is simply to ensure

25     that the mail gets delivered or that the work of inspectors

33

```
 1    is intended to ensure that the mail gets delivered.  And we
 2    disagree with Your Honor.
 3              THE COURT:  But isn't the post office a lot more
 4    than delivering the mail?
 5              MR. OSBORN:  Yes, it is.  In fact, the post office
 6    has established a Postal Inspection Service, but that Postal
 7    Inspection Service isn't -- actually they didn't establish
 8    it.  It was established by Congress separately from the post
 9    office.  Congress has separately created the Postal
10    Inspection Service, and that inspection service does a lot
11    more than -- and you heard the testimony that was elicited
12    both from the plaintiffs' witnesses and from some of the
13    defendant's.
14              The laws that the postal inspectors enforce are
15    federal laws.  Some of them are postal laws.  A great number
16    of them really have no connection to the Postal Service or
17    the post office.  It's simply that the crimes that they have
18    committed happened to use the mails as the vehicle for
19    committing the crime.  But the trafficking of narcotics, our
20    view is that that has nothing to do with the post office.
21              In fact, and this will sound a little bit
22    perverse, but if the narcotics were allowed to get from the
23    mailer to the recipient, one could argue that the post
24    office is operating perfectly and wonderfully as it should
25    because packages are getting from A to B.  The enforcement
```

1   of the drug-trafficking laws by postal inspectors has

2   nothing to do with the post office.  It's simply that the

3   suspect or the criminal has decided to use the post office

4   as the vehicle for his crime.

5          THE COURT:  If the post office, you know,

6   solicited drug dealers:  We have absolutely reliable

7   service.  Think about using us, reliable service.  Wouldn't

8   that have an effect upon the integrity of the post office as

9   a whole?

10         MR. OSBORN:  Well, again, I noted that my example

11  was a bit perverse, but if we're in a situation where -- you

12  know, if drugs are legalized, no, it wouldn't.  I mean, the

13  mail is getting from A to B.  Again, I know that sounds odd,

14  but if that's what you're measuring, if you're measuring the

15  integrity of the operations, get the mail from A to B, it

16  would be working.

17         THE COURT:  But doesn't any business have an

18  interest in ensuring that its goods or services are not used

19  for illegal purposes?  Isn't that part of the integrity of

20  the business?

21         MR. OSBORN:  The answer is yes, and certainly

22  that's part of the function of postal inspectors.  But their

23  primary duty is to conduct criminal investigations.  And

24  when you look at the scope of the laws that they are charged

25  to enforce, it goes way beyond any postal laws.  Again,

1    child exploitation was an example that came up in one of the
2    examinations.

3            THE COURT:  But it's only by virtue of using the
4    mails to generate or transmit that mail.  The postal
5    inspectors don't have a brief to, for example, monitor the
6    internet to see if somebody is trading pornography over the
7    internet and go conduct a sting or a search of somebody's
8    premises if there is no postal involvement; do they?

9            MR. OSBORN:  I don't believe so.  I don't know
10   that, Your Honor, but I don't believe so.

11           THE COURT:  Don't all of their law enforcement
12   activities have some nexus to the post office either because
13   it is a postal crime of one variety or another or the
14   facilities of the post office are being used to carry out a
15   crime that's not, per se, dependent on use of the mails?
16   For example, transmitting pornography, you can do that
17   outside the mails.

18           MR. OSBORN:  I think that's correct, Your Honor.
19   But again, we look at some of the materials that are
20   published by the Postal Service or the Postal Inspection
21   Service.  They represent and I think inspectors are charged
22   with protecting the American public.  They keep talking
23   about postal customers.  Postal customers is effectively
24   equivalent to the American public.

25           So while they do have a responsibility for

```
 1    protecting postal assets and they do have a responsibility
 2    for protecting postal employees, their role and their
 3    responsibility is much broader than that.  It's protecting
 4    the American public.  It's not just the Postal Service.  I
 5    think that's why we disagree with Your Honor in the summary
 6    judgment proceedings at the summary judgment stage.
 7            In fact, Your Honor, 541.203(j) identifies the
 8    type of person who would be nonexempt and therefore entitled
 9    to overtime under the regulations 541.203.  And just to give
10    you an example of an employee who exercises some degree of
11    discretion but is nonexempt, 541.203(j) says:  Public sector
12    inspectors or investigators of various types such as fire
13    prevention or safety, building or construction, health or
14    sanitation, environmental or soil specialists -- it goes
15    on -- generally do not meet the duties requirements for the
16    administrative exemption because their work typically does
17    not involve work directly related to the management or
18    general business operations -- fast forward to the next
19    sentence.  Such employees also do not qualify for the
20    administrative exemption because their work involves the use
21    of skills and technical abilities in gathering factual
22    information, applying known standards or prescribed
23    procedures, determining which procedure to follow, or
24    determining whether prescribe standards or criteria are met.
25            Again, when you look at the first sentence of that
```

1   example, where it says public sector inspectors or

2   investigators who are using skills and technical abilities

3   in gathering factual information.  That's what inspectors

4   do, and the regulations contemplate that those types of

5   folks are not going to be deemed administratively exempt.

6           Now, you heard quite a bit of testimony related to

7   the ability of inspectors to make recommendations.  The only

8   point I would make on that, Your Honor, is that while from

9   time to time they do make recommendations and those

10  recommendations may ultimately get adopted by somebody up

11  the chain of command, that's not the inspector's primary

12  duty.  If you go back to primary duty --

13          THE COURT:  But don't the regs themselves

14  recognize the fact that one doesn't have final authority and

15  makes recommendations is not dispositive of whether one is

16  exempt?

17          MR. OSBORN:  They do, Your Honor.  I would simply

18  point out that, you know, the evidence in this case is that

19  Mr. Nigg made a recommendation at one point with respect to

20  a mail practice.  I think in Mr. Belz's testimony there is

21  an example of some inspector, actually some unidentified

22  inspector at some unidentified date made the recommendation

23  about credit card verification.

24          THE COURT:  Right.

25          MR. OSBORN:  Aside from those couple of things,

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   there is really nothing in the record that shows that these

2   folks are making recommendations that relate to policies or

3   practices of the Postal Inspection Service.  It's not their

4   primary duty.  I think you even asked one or two of the

5   inspectors when they were on the stand:  Do you set policy?

6            THE COURT:  Well, I think it's agreed they don't

7   set policy, but they certainly can recommend policy changes.

8            MR. OSBORN:  Certainly.  I mean, any employee at

9   any company I would assume could make recommendations.  It

10   doesn't mean they're --

11            THE COURT:  But I think that goes too far.  The

12   person in the mailroom, the deliveryman in the mailroom, can

13   make recommendations to the CEO, but that's a far cry from

14   having people trained in various aspects of the Postal

15   Service's operations make recommendations about improving

16   the operations.

17            MR. OSBORN:  I see the Court's distinction.  I am

18   not sure it's that great.  I mean, if the guy in the

19   mailroom makes a great suggestion and it gets adopted -- I

20   guess your point is --

21            THE COURT:  But don't they routinely make

22   recommendations in terms of certain cases to prosecute or

23   not prosecute?  Don't they routinely make recommendations

24   with respect to certain types of search warrants?

25            MR. OSBORN:  I don't believe they make

1    recommendations with respect to the prosecution letters.  I

2    think the testimony is a bit fuzzy on that.  I think what

3    happens is --

4         THE COURT:  Well, the way I heard the testimony,

5    in some instances, depending on the supervisor, they can

6    take a recommendation letter directly to an assistant United

7    States Attorney.  In some instances they run it by the team

8    leader, the 14, and he says yay or nay.

9         MR. OSBORN:  I think, Your Honor, the distinction

10   that I would draw is you call it a recommendation letter.

11   It's not a recommendation letter.  It's a presentation

12   letter.

13        THE COURT:  But by presenting it to the 14, the

14   recommendation is let's take this to the assistant United

15   States Attorney; isn't that correct?

16        MR. OSBORN:  They actually don't make

17   recommendations.  What they've done is they have gathered

18   facts, made a determination that they have got enough

19   factual evidence to proceed, and they give that information

20   to a superior, whether it's the Level 14 leader or the

21   government; and that determination is then made by the

22   government.

23        They're not recommending.  They're not saying,

24   here we have got this thing.  We think you should go after

25   this guy.  What they're saying is we collected this

```
 1    evidence; we believe a crime has been committed that could

 2    be prosecuted.  Here it is.  They are not making a

 3    recommendation about go after these folks.

 4            It's a distinction, a very fine distinction.

 5            THE COURT:  Well, I would disagree with you as a

 6    factual matter.  For what purpose do they gather all this

 7    information and put it in the presentation letter to take to

 8    the U.S Attorney?  I mean, implicitly it's a recommendation

 9    that we pursue this.

10            MR. OSBORN:  Well, let me point out, Your Honor,

11    that an inspection service manual -- and I'm not sure if

12    it's in the 2010 version or only in the 2004 version --

13    there is a specific provision that says you're not to make

14    recommendations in presentation letters.

15            I think the inspection service is drawing a

16    distinction between a recommendation and simply presenting

17    the letters.  I understand Your Honor's point.  I draw a

18    fine distinction.  I don't know that it's necessarily a

19    recommendation just because they are doing their job and

20    they've come up with what they think is sufficient evidence.

21    But I understand the Court's point.

22            Just two more points, Your Honor.  I know I'm

23    running a little long.  There was a lot of emphasis on

24    dollars and cents saved.  I am sure the Court is familiar

25    with 541.202(f).  I will identify that for the Court real
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    quick.

2              THE COURT:  Well, (f) simply says if there are

3    economic consequences for the failure of an employee to do a

4    job correctly, that doesn't necessarily mean he has

5    discretion.

6              MR. OSBORN:  Correct.  I think the Court should be

7    aware that, you know, yes, there are many instances where

8    the inspectors save the postal service money or they -- but

9    again, you're right.  There is a reg that says that's not

10   dispositive on the issue of whether they're exercising --

11             THE COURT:  I think (f) is written the other way

12   around, that if the failure to perform correctly has

13   economic consequences, adverse economic consequences to the

14   business, that isn't an indicia of discretion.

15             MR. OSBORN:  I think you are correct.  I am sort

16   of looking at the corollary that you're not necessarily,

17   just because you save money or find money for the postal

18   service doesn't mean you are --

19             THE COURT:  Is it important to the business to

20   find money or save money?

21             MR. OSBORN:  It's important to every business to

22   find money or save money.  Again, I just don't think the

23   regs contemplate this particular -- just because you're

24   conducting these investigations that save money or find

25   money, that's not what the regs are talking about in terms

42

1    of matters of significance.  They're talking about running

2    the business.

3              It wouldn't make sense that the matter of

4    significance turns or whether or not your investigation is

5    successful.  What if they do an investigation and they

6    save -- they find a million dollars for the post office?

7    And it's significant if they do an investigation that

8    results in no indictment, no prosecution, then their work is

9    not significant?

10             THE COURT:  But if one engages in work that is

11   designed to save money, whether it does every time or not,

12   that's the question.  Is that of significance?  I mean,

13   nobody is successful 100 percent of the time in anything.

14             MR. OSBORN:  I think, Your Honor, we don't read

15   the regs as drawing a bright line about dollars and cents as

16   determinative of whether the discretion you exercise is

17   significant.

18             THE COURT:  Okay.

19             MR. OSBORN:  One last comment on --

20             THE COURT:  Don't we have testimony that the work

21   of a postal inspector literally saves hundreds of millions

22   for the Postal Service?

23             MR. OSBORN:  Yes, Your Honor.  But again, I think

24   what happens is that --

25             THE COURT:  I understand your philosophical point

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  you have, but don't we have testimony that they are just not

2  isolated small matters but over a period of time and

3  continuing they're significant amounts?

4          MR. OSBORN:  Yes, I would agree, Your Honor.

5          THE COURT:  Okay.

6          MR. OSBORN:  The last point that I would draw or

7  make relates to the highly compensated 541.601.

8          THE COURT:  Well, at least on the present record

9  we have a partial failure of proof because we can't tell who

10  made more than $100,000.

11          MR. OSBORN:  Right.  That was the point I was

12  going to make.

13          THE COURT:  But isn't that somewhat cured by

14  bifurcation?

15          MR. OSBORN:  Yes.  I think we would end up

16  revisiting that issue if the Court were to rule for us, yes.

17          THE COURT:  But help me understand the highly

18  compensated exemption as compared to the straightforward

19  administrative exemption.  What don't you have to prove?

20  What's the difference?

21          MR. OSBORN:  Under 541.201 you have got, for the

22  administrative exemption, you have got the traditional

23  two-part test.  If any part of that fails, the employee is

24  entitled to overtime.

25          THE COURT:  Right.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

44

```
 1              MR. OSBORN:  The employer has the argument
 2    available to him that if the employee makes over $100,000
 3    per year, then they don't have to establish both prongs of
 4    the administrative exemption.  They only have to establish
 5    one of the two prongs -- either office, nonmanual work
 6    directly related to the management or general business
 7    operations of the employer, or exercises discretion and
 8    independent judgment on matters of significance.
 9              However, there is a carve-out to that under
10    541.601(d) which says that if your work is deemed to be
11    manual, non-office, it doesn't matter how much you make.
12    You are not subject to the highly compensated -- it's really
13    not called an exemption.  It's called a test.
14              With that, Your Honor, I will turn the podium over
15    to Mr. Beins.
16              THE COURT:  Mr. Beins.
17              MR. OSBORN:  I'm sorry, Your Honor.  I would ask
18    the Court if we could do my remarks about the administrative
19    exemption and then have Mr. Axe --
20              THE COURT:  That's fine.
21              MR. AXE:  Before we begin, could we possibly take
22    a brief recess?
23              THE COURT:  Sure.  Let's be in recess for ten
24    minutes.
25              (Recess.)
```

```
1              THE COURT:  Mr. Axe.

2              MR. AXE:  Thank you, Your Honor.

3         Your Honor, on October 7, 2011, this Court denied

4  defendant's motion for summary judgment in part.  The

5  remaining FLSA issues have now been tried before the Court.

6  In this closing argument I will take each in order

7  identifying for the Court the relevant and significant

8  evidence that supports findings in favor of the defendant

9  Postal Service.

10             The first issue the Court considered was whether

11 existing legal authority established that postal inspectors

12 are covered by the administrative exemption.  By existing

13 legal authority, I am referring to the 1976 DOL letter, the

14 Dymond case, and the Sprague case.

15             In denying defendant's motion for summary

16 judgment, the Court noted that the duties of postal

17 inspectors have changed since the 1980s, including the

18 transfer of the audit function to the Office of Inspector

19 General.

20             The Court then found that it would have been

21 reasonable for the Department of Labor to conclude that all

22 postal inspectors, including specialists, perform some of

23 the other major duties set forth in the letter, including

24 the audit duty.

25             The Court thus concluded that based on the record
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

before it on summary judgment, the removal of the audit

function appeared to constitute a significant change that

cast doubt on the continuing legitimacy of the 1976 opinion

letter.

         The Court now has the benefit of a full record

following trial upon which to more fully evaluate this

issue.  Here is the relevant evidence that has been

established over the last few days.  First, it is undisputed

that prior to 1976, as set forth in the direct testimony of

Jim Belz, that the Postal Inspection Service had postal

inspectors who were specifically assigned to perform the

audit function.

         It is also undisputed that a vast majority of

postal inspectors were not assigned to the function of

performing audits.  And for those postal inspectors who were

not assigned to audit teams, they did not frequently perform

audits.

         A full trial has failed to produce any evidence

that postal inspectors in the 1970s who specialized in

non-audit areas such as mail fraud actually performed audits

to any significant extent.  In light of the record at trial,

this Court no longer has a basis for assuming that the

Department of Labor relied on an assumption that inspectors

generally performed audit work in rendering its opinion

because that is not a factually accurate representation of

47

1    the actual work of postal inspectors in the 1970s.

2            Now that we have a complete factual record to

3    demonstrate that a small percentage of postal inspectors did

4    mainly audits and many others did not --

5            THE COURT:  But the Department of Labor did point

6    to audit as one of the functions upon which it relied in

7    concluding that the administrative exemption applied;

8    correct?

9            MR. AXE:  That's correct, Your Honor, but there is

10   nothing in the letter to indicate that the basis for the

11   assertion of the administrative exemption was based on the

12   fact that all postal inspectors performed audits to a

13   certain extent.

14           THE COURT:  I agree.  And the letter doesn't give

15   weight to any of those functions either in reaching the

16   conclusion that the postal inspectors are administratively

17   exempt.

18           MR. AXE:  That's correct, Your Honor.  So what I'm

19   presenting to the Court is that now that we have a full

20   record, we can see that factually prior to 1976 the way the

21   Postal Inspection Service worked was that some group of

22   people did audits mainly, and most did not.  The Department

23   of Labor is delegated by Congress to make a determination

24   whether or not an employee, based on the position

25   description and whatever other work it does, whether it's

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   interviews with employees, whether it's discussions with

2   management, whether that employee fits the administrative

3   exemption test.

4           Here as we look back, we don't have the people who

5   can come and testify on the stand to say exactly what they

6   said, so we can only look at the surrounding evidence and

7   the evidence that we have in the record.  So one bit of

8   evidence, as the Court has noted, is this letter which

9   identifies three main program areas.  So we also know that

10  factually the way the defendant has described it is correct.

11          THE COURT:  But you can't -- where you're going

12  with your argument is you're saying that the letter is

13  somehow preclusive on the underlying issue.  I mean, the

14  letter could be dead-bang wrong, but the good-faith defense

15  would still be there.  I think what we are dealing with

16  right now is whether in fact the postal inspectors are

17  administratively exempt based on what they do.

18          MR. AXE:  I agree, Your Honor, and I intend to

19  move on to that.  But I just want to lay out the facts that

20  I believe will allow the Court to rule that the letter is

21  still valid today and that there is no basis for finding

22  that it's not --

23          THE COURT:  Why don't you hold those remarks until

24  Mr. Beins has -- well, I'm sorry.  It's your burden, so go

25  ahead.

1          MR. AXE:  Thank you.  To presume the Department of

2     Labor acted on an incorrect assumption is to presume several

3     things.

4          THE COURT:  But we don't have to go there.  Can't

5     we just take the testimony of plaintiff's own expert on that

6     issue who said you can take the letter at face value?  You

7     don't have to concern yourself with the extent of the

8     analysis.  You don't have to concern yourself whether the

9     Department of Labor made a study.  You are entitled to rely

10     on the letter on its face.  Isn't that the end of the

11     inquiry as far as the letter itself goes?

12          MR. AXE:  That's correct, Your Honor.  But in the

13     Court's order on the summary judgment briefing, it appeared

14     that the Court made some presumptions based on what the

15     letter stated, and I think the additional evidence that has

16     come in should change the Court's view of what DOL likely

17     did.

18          If I could just lay out briefly.

19          THE COURT:  Okay.

20          MR. AXE:  The first presumption seems to assume

21     that the Department of Labor did not do its job correctly.

22     There is no basis in the record for an assumption that DOL

23     incompetently carried out the duties it was designed to

24     perform.  And as you note, plaintiff's expert, Don Wiley,

25     conceded he had no basis for speculating that DOL did not

1  carry out its congressionally delegated --

2              THE COURT:  But didn't he in effect say it doesn't

3  matter?

4              MR. AXE:  That what doesn't matter, Your Honor?

5              THE COURT:  Assume that the Department of Labor

6  got it wrong.  In terms of the good-faith defense, didn't he

7  basically testify it doesn't matter, that the Postal Service

8  is entitled to take the letter at face value?

9              MR. AXE:  That's correct, Your Honor, with respect

10 to the good-faith defense.  What I am presenting is that we

11 have a letter that says that all postal inspectors are

12 exempt.

13             THE COURT:  Okay.

14             MR. AXE:  And they identify three categories.

15             THE COURT:  Right.

16             MR. AXE:  And the question is:  Can we take from

17 that -- just looking at the audit issue, which I'll address

18 in a moment, but can we look at that and say does the

19 removal of the audit function affect this letter in any way,

20 shape, or form?

21             I think we would all agree that if the letter said

22 one-third of inspectors only perform audit, one-third

23 perform only security, and one-third only perform criminal

24 investigative work, and all of them are exempt, we wouldn't

25 be here, because you would take the one-third audit people

51

```
 1    out and then there is no basis in the record to assume that
 2    postal inspectors in 2012 who do security or criminal
 3    investigative work do it differently or have less discretion
 4    than those who did it prior to 1976.
 5              THE COURT:  But doesn't Mr. Van der Merlen's
 6    testimony -- and it's not controverted -- tell us that the
 7    removal of the audit function caused there to be a greater
 8    degree of independent judgment and discretion?
 9              MR. AXE:  That's correct, Your Honor.
10              THE COURT:  If we listen to Mr. Van der Merlen,
11    really the weak link in the Department of Labor's 1976
12    analysis is that they extended it to audits.
13              MR. AXE:  I am sorry.  Can you say the last thing
14    again?
15              THE COURT:  Sure.  Isn't the net of his testimony
16    that the weak link in the Department of Labor's analysis in
17    1976 was that it extended the exemption to the audit
18    function?
19              MR. AXE:  I think that's correct, Your Honor, and
20    I will talk directly about audit right now, because the
21    Court has already ruled that one of the prongs has been
22    satisfied by all postal inspectors.  And 29 CFR 541.201 is
23    the section that CFR entitled directly related to management
24    or general business operations.
25              THE COURT:  The Court has ruled on summary
```

1    judgment.

2          MR. AXE:  And in that regulation it states that

3    work directly related to management or general business

4    operations includes auditing.  But that's the only place in

5    the regulation where the word auditing occurs.

6          So in this case, because the Court has already

7    ruled on that, we have to ask ourselves:  What are we

8    talking about with respect to this analysis of the

9    administrative exemption?  Does auditing have some special

10   place with respect to either the office nonmanual issue or

11   the discretion issue such that that would have been a

12   significant change?  And as the Court has observed,

13   Mr. Van der Merlen said, if anything, postal inspectors

14   doing audit had less discretion.

15         THE COURT:  Right.

16         MR. AXE:  So is there something special about

17   audit work that rises to the level of being office or

18   nonmanual that that was the deciding factor in the DOL

19   letter?  There is no evidence of that.  And we heard

20   evidence that some of the work that's done by postal

21   inspectors doing audit doesn't involve physical-type tasks

22   like surveillance and driving around and moving boxes

23   directly related to the function that is being performed,

24   which is the audit.  Just like moving boxes if I am doing an

25   investigation is directly related to the work of the

1    investigation.  I am not a U.S.P.S. mailroom mail handler

2    whose job is to move boxes all day long.

3            So I think the Court has correctly observed that

4    Mr. Van der Merlen has identified what the issue was with

5    respect to audits and why it's not significant.  And I will

6    just note briefly because we have briefed it, Your Honor, in

7    the 1980s you had those two cases that had the benefit of

8    actually having the submissions and more closely in time to

9    the 1976 opinion letter, Sprague and Dymond, and they both

10   ruled that the 1976 opinion letter was valid.

11           And specifically in the Sprague case it noted that

12   the Postal Service's submissions were a part of the record.

13   It noted that its review of the submissions suggested no

14   result different from that reached by the Wage and Hour

15   Division.  It found that the submissions provided a

16   more-than-adequate basis on which to conclude that postal

17   inspectors, even those engaged in pure law enforcement

18   roles, were administratively exempt.  And significantly the

19   Court noted, quote, that the Wage and Hour Division

20   requested only certain information to determine the postal

21   inspectors' status is little more than a repetition of its

22   40-year experience in interpreting the administrative

23   employee exemption.

24           So on that basis I think the Court has solid

25   grounds to rule that the DOL opinion letter on its face is a

54

1    valid opinion letter notwithstanding the good-faith defense

2    which we will talk about later, and the existing case

3    authority does support the continuation of the exemption.

4              I will continue on now, though, to talk about the

5    administrative exemption.  I just also note as an

6    evidentiary citation for the Court that Mr. Milarski

7    explained in his direct testimony at paragraph 26 that there

8    were no circumstances or changes since 1976 that would

9    affect the Postal Service's classification of postal

10   inspectors as FLSA exempt.  That was undisputed.

11             There have been no significant changes in the job

12   duties of postal inspectors since 1976, from his testimony.

13   He further testified in his written testimony that although

14   certain functions such as audit were shifted, the evidence

15   established the shift in functions, which, I would suggest

16   that the evidence establishes that the shift in functions

17   did not change the day-to-day duties for the vast majority

18   of postal inspectors.

19             Moving on to the administrative exemption, unless

20   the Court has additional questions.

21             THE COURT:  No.

22             MR. AXE:  So the first issue for the Court to

23   consider is whether the inspector's primary duty is the

24   performance of office or nonmanual work.  I believe

25   plaintiff's counsel several times described it as office,

1   nonmanual work, but there are two parts to that.  And I

2   think the Court observed that.

3           In the October 7, 2011, order the Court found

4   there existed this question of fact on the issue because the

5   Postal Service's description of the work done by postal

6   inspectors, tasks such as working in offices, conducting

7   criminal investigations by reviewing documents, data mining,

8   interviewing witnesses, conducting static surveillance from

9   cars, preparing reports, meeting with AUSAs and postal

10  employees, all of which has come into evidence during the

11  course of the trial, contrasted with the description of work

12  as characterized by plaintiffs, arresting suspects, carrying

13  firearms, and being required to exert physical force if

14  needed.

15          THE COURT:  But they do do all those things.  It's

16  just a question of proportion; isn't it?

17          MR. AXE:  That's correct, Your Honor.  And I think

18  now that we have had a trial and we've actually been able to

19  hear testimony, we have a much better understanding as to

20  frequency of these tasks.  I think the Court has observed

21  that it seems to be undisputed with respect to the frequency

22  of a number of tasks, not all of them; although, with

23  respect to arrests, when the Court sees a declaration that

24  says postal inspectors make arrests and the Court hears

25  testimony that someone made four arrests in the course of a

56

1    year, whether they chased suspects.  But then when the Court

2    hears testimony that someone chased a suspect once in his

3    career, I think there's a difference.  Now the Court has the

4    opportunity to weigh the frequency of some of these physical

5    tasks.

6         According to 29 CFR 541.3(a), the FLSA exemptions

7    don't apply to manual laborers or other blue-color workers

8    who perform work -- and this is the words that the Court

9    noted, but the plaintiffs did not include in some of their

10   discussions -- perform work involving repetitive operations

11   with their hands, physical skill, and energy.  Just because

12   the Rooney Court potentially -- and I need to check --

13   didn't use the phrase repetitive operations with their hands

14   doesn't mean that a number of other Courts and the

15   regulations themselves don't include the words repetitive

16   operations with their hands.

17        I will note the phrase is repetitive operations

18   with their hands, physical skill, and energy.  This is not a

19   you can pick one of the three if you like test.  For work to

20   fit into the category of manual work, it must include all

21   three.

22        Plaintiffs have argued that the physical nature of

23   a small part of their job duties should compel the Court to

24   classify them as a whole as performing manual work.  But as

25   the Court has noted, physical work alone does not

1    necessarily equal manual work under the regulations.  That's

2    what the regulations are for.  They identify the following

3    as examples of jobs that involve repetitive operations with

4    one's hands, physical skill, and energy.

5              Nonmanagement production-line employees and

6    nonmanagement employees in maintenance, construction, and

7    similar occupations such as carpenters, electricians,

8    mechanics, plumbers, ironworkers, craftsmen, operating

9    engineers, longshoremen, construction workers, and laborers.

10             And 29 CFR Section 541.703 explains that work that

11   is, quote, directly and closely related to the performance

12   of exempt work is also considered exempt work.  And the

13   phrase directly and closely related means tasks that are

14   related to exempt duties and that contribute to or

15   facilitate performance of exempt work.

16             Thus directly and closely related work may include

17   physical tasks and menial tasks that arise out of exempt

18   duties and the routine work without which the exempt

19   employee's exempt work cannot be properly performed.  So

20   here the exempt work of postal inspectors includes

21   performing complex criminal, civil, and administrative

22   investigations.  That is their primary duty.  That is the

23   principal, main, major, and most important duty that the

24   typical postal inspector performs.

25             Arrests, the physical completion of a complex

investigation, don't defeat the exemption.  During the

course of an investigation a postal inspector may perform

certain physical work that is directly and closely related

to the criminal investigative work, but that doesn't change

the classification.

THE COURT:  Give me the cite again.

MR. AXE:  541.703(a), Your Honor.

THE COURT:  Okay.

MR. AXE:  It was undisputed during the trial that

arresting suspects is not something that happens on a daily,

weekly, or sometimes even monthly basis for most inspectors.

That goes the same for other physical tasks identified by

the plaintiffs that happen on an infrequent basis, such as

the chasing suspects and struggling with suspects that I

mentioned.

The remainder of the tasks described by postal

inspectors is having a physical component including the

static surveillance while done in a car.  We heard testimony

about while some inspectors or at least one, while he was in

the car, he could update his case files at the time --

arguably not much different than sitting at a work desk in

an office if you're able to do that.  Those tasks don't have

any correlation to the regulatory language which defines

manual labor as repetitive operations with one's hands,

physical skill, and energy.

```
 1              So based on the undisputed testimony of the
 2    limited amount of physical work that is actually done by
 3    postal inspectors, there is no basis for this Court to find
 4    that postal inspectors perform manual work as their primary
 5    duty.  The character of the work simply does not fit within
 6    the language of the regulations.
 7              Now, in the proposed findings of fact and
 8    conclusions of law that we submitted, at paragraphs 44
 9    through 53 of the conclusions of law, we set forth the
10    relevant findings in the case of Adams -- distinguished from
11    Adam -- Adams versus United States, a 1992 federal claims
12    court case.  The Adams case was a consolidated FLSA overtime
13    action involving employees from seven federal agencies,
14    including federal investigators from ATF, DEA, IRS, Secret
15    Service, and Customs Service.
16              Now, the Adams case, which is October of 1992,
17    contrasts with the Adam case cited by the plaintiffs that
18    was July 20, 1992.  The Adams case has a very convoluted
19    history.  If you do a Westlaw cite check, it goes up and
20    down on multiple issues.  But if you go all the way back to
21    the first case, it's the only time they deal with the issue
22    of office nonmanual.
23              And the main distinction between the Adam
24    employees and the Adams employees is that the Adam employees
25    cited by plaintiffs were INS senior border patrol officers.
```

1    Their job is to go round people up.  I think the Court can

2    take judicial notice of the description of their work

3    performed in the case as to how border patrol officers

4    perform their jobs.

5            In the Adams case there is a discussion about the

6    investigative work that is done by those investigators, and

7    the Court undertook this analysis for each of the different

8    investigative groups.  We outlined them in the proposed

9    conclusions of law.

10           For each the Court found that the work they

11   performed was nonmanual, even though there was evidence that

12   some of the work, quote, may be physically active work,

13   including participating in raids, searches, seizures, or

14   arrests.  And similarly, the Court found that the existence

15   of physical fitness requirements did not serve to indicate

16   that the investigators performed any manual labor as defined

17   by DOL's existing regulations.

18           Therefore, the Court should find that postal

19   inspectors are white-collar, criminal investigators and that

20   they are not manual laborers.  The facts that support such a

21   finding can be found in the direct testimony of Rich Tennel

22   at paragraph 24; and in the deposition testimony of

23   Inspectors Bernardo, who is a plaintiff, page 41, lines 11

24   to 20, and Cowley, another plaintiff, page 21, lines 11 to

25   20.

 1          The Court also heard the testimony of Inspector

 2   Fiene that the percentage of time he spends in his office is

 3   50 percent of his overall workload and that only 10 to 15

 4   percent of the work in DMI that he does is physical.

 5   Inspector Brooks thought that five percent of his job was

 6   manual.  As the Court noted, Inspector Gutierrez testified

 7   that for postal inspectors in revenue fraud, they can spend

 8   as much as 80 to 85 percent of their time in the office.

 9          Obviously the Court has a situation where we have

10   a class of people.  We have a class of people doing

11   different program assignments.  So clearly somebody who is

12   working in external crimes by definition will probably be

13   out of the office a little bit more than somebody who's

14   working in revenue fraud.

15          Plaintiffs have chosen to bring this as a

16   collective action.  The Department of labor treated the

17   postal inspectors as a collective group when it issued its

18   letter.  It didn't issue three letters.  So looking at the

19   extremes is not what this Court is obligated to do.  As the

20   Court has noted, the question is what does the typical

21   postal inspector do.

22          The defendant contends that every postal inspector

23   fits within this administrative exemption for the reasons we

24   have argued.  For the time that postal inspectors are out of

25   their office, they are engaged mainly in these nonmanual

1  tasks that I discussed -- static surveillance, conducting

2  interviews, meeting with prosecutors and postal employees.

3          Unless the Court has questions on the office

4  nonmanual, I'll move on.

5          In the test the second issue for this Court to

6  consider is whether the inspector's primary duty includes

7  the exercise of discretion and independent judgment with

8  respect to matters of significance.  So let's start with the

9  discretion and independent judgment portion of the test.

10         As the Court noted in its October 7, 2011, order

11  citing 29 CFR 541.202(a), in general the exercise of

12  discretion and independent judgment involves the comparison

13  and evaluation of possible courses of conduct in acting or

14  making a decision after the various possibilities have been

15  considered.  That's the general test.

16         The Courts have had to struggle with that, and the

17  regulations continue on with some helpful guidance so that

18  Courts have a better ability to interpret what the phrase

19  possible courses of conduct, acting or making a decision,

20  what that means.

21         The Court noted the list of factors set forth at

22  29 CFR 541.202(b).  The Court declined to grant summary

23  judgment on this issue noting it was a close call, that the

24  postal inspectors were able to raise triable issues of fact

25  through their declarations contending that they did not meet

1  any of the factors outlined in 541.202(b).

2          Now, I'll note for the Court -- and we did in our

3  briefing -- that the factor list is non-exhaustive.  An

4  employee did not satisfy all of the factors in order to

5  satisfy this element of the administrative exemption test.

6  The preamble to the final rule notes that Federal Courts

7  generally find that employees who meet at least two or three

8  of these factors exercise discretion and independent

9  judgment.  That cite is 69 Fed. Reg. 22143.

10          The factors set forth are taken from existing

11 regulations at the time or developed from facts which

12 Federal Courts have found relevant when determining whether

13 an employee exercises discretion and independent judgment.

14          Other factors which Federal Courts have found

15 relevant in assessing whether an employee exercises

16 discretion and independent judgment include the employee's

17 freedom from direct supervision, troubleshooting or

18 problem-solving activities on behalf of management, use of

19 personalized communication techniques, authority to handle

20 atypical or unusual situations, responsibility for assessing

21 customer needs, and primary contact to public or customers

22 on behalf of the employer.  That cite is 69 Fed. Reg. 22144.

23          Early on in the trial of this case, the Court

24 seemed to be concerned with the fact that postal inspectors

25 sometimes had to get approval of their supervisors.  I think

64

1    we have had discussions about the fact that approval and the

2    need for approval does not defeat the issue of discretion.

3            So I would like to go through some of these

4    factors because defendant contends that the postal

5    inspectors meet at least seven of the ten factors, which is

6    for more than the two or three needed to support a finding

7    that they exercise discretion and independent judgment with

8    respect to matters of significance.

9            Factor number one -- and I will identify them

10   based on the number in the regulation.  Postal inspectors

11   have the authority to implement management policies and

12   operating practices.  I will note for the Court that in the

13   regulation the full factor says whether the employee has

14   authority to formulate, effect, interpret, or implement

15   management policies or operating practices.

16           Plaintiffs throughout the litigation have focused

17   on the earlier parts of that sentence.  We will focus on the

18   last one since the word is or, not and.  The Court heard

19   testimony about how the Postal Service enacts policies and

20   the postal inspector's work to implement those policies.

21   But technically we didn't hear the testimony, but it's in

22   the declaration of Mr. Miskanic at paragraph 71.  He

23   explains that the Postal Inspection Service is responsible

24   for all security matters relating to the Postal Service.

25   Policies issued by the Postal Service related to security

1   matters are formulated and implemented by inspectors.

2           One such policy involves zero tolerance for acts

3   of violence committed by postal employees.  This policy was

4   formulated by the Postal Service based upon the

5   recommendations and input from postal inspectors, and it is

6   implemented through the work of postal inspectors and the

7   Postal Inspection Service.  That is undisputed.

8           A second undisputed example is set forth in

9   paragraph 72 of the direct testimony in which Mr. Miskanic

10  references the Postal Service operating practice involving

11  registered mail.  Postal inspectors were involved in the

12  formulation and implementation of the restrictions involved

13  in using registered mail for official purposes.

14          Another example involves the operating policy for

15  the mailing of parcels over a certain weight and the

16  acceptance procedures by postal personnel of such mail, as

17  well as the operating practices for accepting such mail in

18  collection boxes.  Postal inspectors were responsible for

19  the development of these protocols based on aviation

20  security requirements in the aftermath of September 11th.

21  That was undisputed.

22          I'll move to factor two.  Postal inspectors carry

23  out major assignments in conducting the operations of the

24  Postal Service.  Multiple witnesses have already testified

25  that they considered their work to be major assignments for

1    the Postal Service, including the following three witnesses

2    who acknowledged that they considered their work to

3    constitute major assignments in conducting the operations of

4    the Postal Service.

5            Plaintiff Ross Hinckley at his deposition, page

6    170, line 21, to 171, line 1; plaintiff James Bernardo in

7    his deposition, page 142, lines 5 to 10; and Inspector

8    Brooks during his cross-examination.  Additionally, the

9    testimony of the Postal Service witnesses of the significant

10   work they perform on behalf of the Postal Service supports a

11   finding that postal inspectors carry out major assignments

12   in conducting the operations of the Postal Service.

13           Next factor, number three, postal inspectors

14   perform work that affects business operations to a

15   substantial degree.  The work of postal inspectors

16   investigating crimes against postal employees and customers

17   and the work of the Postal Inspection Service security teams

18   affects the business operations of the Postal Service on a

19   daily basis.

20           Additionally, the following witnesses testified

21   that postal inspectors perform work that affects the

22   business operations of the Postal Service to a substantial

23   degree.  James Bernardo in his deposition, page 142, lines

24   11 to 21; Ross Hinckley in his deposition, page 171, lines 4

25   to 12; Inspector Miskanic in his direct testimony at

1    paragraph 17; Ralph Perez in his deposition, page 97, line

2    19, to page 98, line 12.

3           I'll move to the fifth factor -- fifth on the

4    list, fourth that I'm describing.  Postal inspectors have

5    the authority to waive or deviate from established policies

6    and procedures without prior approval.  This is an

7    interesting factor because most people when asked if they

8    have the authority to deviate from policies and procedures

9    will say, no, that's what the policy and procedure is for.

10   I can't deviate from it.

11          But the Court heard the testimony of Inspectors

12   Brooks and Tennel about a situation in which Inspector

13   Brooks deviated from Postal Inspection Service policy

14   without prior approval when he took a suspicious package to

15   his house and made the decision to open it.

16          THE COURT:  Does the fact that one flaunts a

17   policy constitute the ability to deviate under the terms of

18   the regs?

19          MR. AXE:  Your Honor, I don't know that Inspector

20   Tennel would have characterized it as flaunting the policy.

21   I think he acknowledged that -- I think he stated that he

22   wouldn't have made that decision but that Inspector Brooks

23   did make the decision.  I don't think Inspector Brooks was

24   penalized or subject to any discipline for doing that.

25          We are not going to contend that this is something

1    that postal inspectors do on a regular basis, but clearly

2    this is an example of someone deviating from policy.  Of

3    course, when you think about policy, one would hope that

4    employees didn't on a regular basis deviate from policy.

5         Frankly there is very little case law that talks

6    about what this factor means, the ability to deviate from

7    policies.  As the Court is, I am sure, of the opinion as are

8    most people, if one has an employee and one is given the

9    employee policies, the expectation is that they won't

10   deviate from it.

11        So perhaps this factor goes to the idea that

12   someone has the discretion if something comes up that hadn't

13   been thought of and is not in the policies, that they have

14   the authority to deviate from the existing policies as an

15   exception.  But clearly since the cases don't spend a lot of

16   time talking about this, this is not a factor that we would

17   say is the definitive factor for the Postal Service.  But we

18   do have evidence of it.

19        The next factor, the seventh listed and the fifth

20   for the Court, is that postal inspectors provide

21   consultation and/or expert advice to management.  Now, we

22   have seen a perfect example of that in the letters written

23   by Inspector Nigg to Postal Service management about

24   proposed policy changes.

25        There are a number of other instances throughout

69

1  the testimony of consultation and advice that the postal

2  inspectors give to postal management with respect to

3  information they learn through the outgrowth of their

4  investigations, because they serve a dual purpose.  One

5  purpose is doing an investigation.  But why are they doing

6  an investigation?  We will get to that momentarily with

7  respect to the issue of significance.

8         They are doing it to support the Postal Service,

9  and they are charged with the mission of looking for ways to

10  improve Postal Service operations, looking for ways to fix

11  things during the course of their investigations.

12         As the Court noted, this is not a mailroom clerk

13  who is simply sending a suggestion in the box to the CEO, as

14  evidenced by the lengthy letter and drafts of letters done

15  by Mr. Nigg to Postal Service management.

16         The ninth factor and the sixth listed by me is

17  that postal inspectors investigate and resolve matters of

18  significance on behalf of management.  Surely this factor is

19  not in dispute.  Issues related to external crimes, revenue

20  fraud, et cetera, all fall under this category.  If the

21  Postal Inspection Service isn't the part of the Postal

22  Service that is doing the investigation and resolving the

23  significant matters for the Postal Service, I am not sure

24  who is.

25         The tenth factor listed and the seventh that we

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   have identified is that postal inspectors represent the

2   Postal Service in handling complaints and resolving

3   grievances.  When telephone calls come in from Postal

4   Service customers, postal inspectors are required to

5   respond.  As set forth by Mr. Miskanic in his direct

6   testimony at paragraph 50, postal inspectors represent the

7   Postal Service in handling complaints by mailers and other

8   customers, and they help resolve grievances and complaints

9   made by customers, employees, and managers.

10          Additionally, the Court heard the testimony of

11  Inspectors Fiene and Brooks.  This goes to the issue of

12  discretion and independent judgment, both of whom testified

13  that they couldn't recall any instance of a team leader

14  declining their requests to jacket a case file or to pursue

15  a prosecution.

16          The Court heard the testimony from Inspector

17  Gutierrez, the Level 13s decide what to investigate on their

18  own.  They could go to the U.S. Attorney's office on their

19  own.  They could close cases on their own.

20          The Court has observed that the factual record

21  includes instances of some inspectors saying that they were

22  subject to greater level of supervision than others,

23  although it is undisputed that they had the ability to make

24  recommendations.  I'll get to that in just a moment.

25          There is no postal inspection policy that dictates

1  exactly how a supervisor is to supervise a Level 13.  If

2  some choose to ask for additional information or more

3  information than others so that they can be kept in the

4  loop, that is not what the regulations consider to be

5  significant in an evaluation of whether an employee does not

6  have discretion and independent judgment.

7       That's one of the reasons why these ten factors

8  are set forth, because it seems from the CFR that the

9  Department of Labor does not want Courts to look solely at

10  the level of interaction between the supervisor and the

11  supervisee.

12       The Court heard the testimony from Inspector

13  Tennel who explained that team leaders don't dictate to

14  Level 13 and below postal inspectors in the manner described

15  and alleged by plaintiffs.  The Court heard the testimony of

16  Inspector Focht, a plaintiff in this case and Mr. Nigg's

17  former team leader, who testified about the level of

18  discretion Mr. Nigg had.

19       Your Honor, during the plaintiff's argument they

20  raised a question perhaps in the Court's mind about whether

21  in the inspection service manual there is a discussion about

22  recommendations, and the Court observed that implicitly by

23  presenting information to the U.S. Attorney's office or to

24  the supervisor, that's a recommendation.

25       But, in fact, in the inspection service manual

72

1   and -- and I will show on the overhead some of the pages --

2   it discusses explicitly that recommendations are expected to

3   be made.  This is page 239 of the 2010 inspection service

4   manual.

5          THE COURT:  What's the exhibit number?

6          MR. AXE:  Exhibit 269, page 288, is the best way

7   to reference it, in the bottom right -- 269, page 288.

8   Section 5-9.2.1.2 talks about objectivity.  Is the

9   Court seeing when I hit the screen these red dots?

10          THE COURT:  Yes.

11          MR. AXE:  The objectivity section -- the Court can

12   read it, but I'll note for the transcript -- that the postal

13   inspectors' opinions should be confined to the conclusion

14   and recommendation portions of the report.

15          I will turn to another example.  For clarity, let

16   me put this in better context, Your Honor.  This is the

17   section in which the recommendation language was included.

18   It's the investigative report section 5-9.1.  Turning to the

19   next page is the page that talks about the objectivity.

20          At the end of the investigative report section,

21   there is a section called closing, where it states:  For

22   example, the closing might include only a summary of the

23   most important points presented, or it might include one or

24   more recommendations.

25          Your Honor, 29 CFR Section 202(e) provides that

1   the exercise of discretion and independent judgment must be

2   more than use of skill in applying well-established

3   techniques, procedures, or specific standards described in

4   manuals or other sources.

5          The Court in its October 2011 order has already

6   found that the postal inspectors did not have any evidence

7   that their discretion was constrained to applying the

8   techniques, procedures, or specific standards outlined in

9   the ISM.  This is related to the Court's discussion with

10   plaintiffs during their closing argument, whether the work

11   that they did was just use of skill in applying

12   well-established techniques, but they omitted the remainder

13   of the regulatory section that constrained it to such

14   techniques that are specific standards described in manuals

15   or other sources.

16          In the Court's order it went on to cite from 29

17   CFR 541.704, describing how the use of manuals like the ISM

18   does not preclude exemption under the FLSA.  So the Court

19   has already opined on this issue raised by plaintiffs in the

20   summary judgment decision.

21          As a reminder for the Court, there is a relevant

22   comparable provisions for postal inspectors raised already

23   by plaintiffs, 29 CFR Section 541.203(a), which notes that

24   insurance claims adjustors are exempt if they perform duties

25   such as interviewing insureds, reviewing factual

1    information, and making recommendations.

2           For the Court's reference, this discussion of

3    541.202(e) is at, I believe, page 17 of the summary judgment

4    motion.

5           There is also the testimony from Ms. McCutchen,

6    defendant's expert, at paragraph 76 with respect to the

7    training issue that was raised by plaintiffs.  Her testimony

8    was that in her opinion -- and this is supported by the

9    regulations -- training is irrelevant as to whether an

10   employee performs exempt duties after the training is

11   completed.

12          As we noted for the Court, and I will cite the

13   section again, 541.202(c), notes that the need for approval

14   does not defeat the discretion and independent judgment

15   analysis.

16          Your Honor, based on the state of the record and

17   the testimony at trial, I don't have much prepared on the

18   issue of matters of significance.  It seems it was

19   undisputed that the work of the postal inspectors is

20   significant, and the Court had previously found that the

21   work that they did was directly related to the business.  We

22   have done an analysis of the factors that show that they

23   perform major assignments and significant work.

24          So unless the Court has additional questions on

25   the discretion and independent judgment factor or would like

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    me to speak more on the matters of significance, I will move

2    on.

3                THE COURT:  That's fine.

4                MR. AXE:  The next issue for the Court to consider

5    is the highly-compensated employee test.  Now, the Court has

6    heard the undisputed testimony from Vivien Belanger that

7    most if not all ISLE postal inspectors receive compensation

8    of at least $100,000 per year.  The Court noted the question

9    of failure of proof.  Unless there is a dispute as to the

10   qualification of those inspectors receive over $100,000 --

11   in other words, unless there is a dispute as to the nature

12   of that $100,000.  I believe it is undisputed that at least

13   some do make over $100,000.

14               THE COURT:  But the present record doesn't allow

15   me to say as to each of the plaintiffs, opting plaintiffs,

16   that they make more than $100,000.

17               MR. AXE:  That's absolutely correct, Your Honor.

18   That would be with respect to damages.  But with respect to

19   the liability issue, the Court could find, if we get to that

20   point, that they meet the highly-compensated test.  And then

21   for damages we'll just do a calculation for those who are

22   under $100,000 -- if the Court is so inclined to reach the

23   merits of the highly-compensated test.  And I will briefly

24   describe for the Court -- and just inquire:  Is it the

25   Court's inclination not to even address the

1    highly-compensated test in its ruling, or would the Court

2    like me to briefly discuss that?

3            THE COURT:  Well, I would address it.  It seems to

4    me the analysis is a subset of the administrative exemption

5    analysis itself, a truncated analysis.

6            MR. AXE:  Yes.  It is and it isn't, because there

7    are some differences in the highly-compensated test.  I'll

8    just outline them for the Court.  According to the

9    regulations, 29 CFR Section 541.601, a high level of

10   compensation is a strong indicator of an employee's exempt

11   status, thus eliminating the need for a detailed analysis of

12   the employee's job duties.

13           Additionally, 29 CFR 541.601(d) states that the

14   highly-compensated employees, the FLSA regulations do not

15   apply, do not apply to employees whose primary duties

16   include performing office or nonmanual work.  There is a

17   distinction.  If you look at the regulations, under the

18   highly-compensated employee test, the phrases include, it's

19   not is.  The undisputed testimony at trial has established

20   that the primary duties of postal inspectors include

21   performing office or nonmanual work whether the primary duty

22   is the performance of office or nonmanual work.  And that

23   goes to the discussion of most important, et cetera.  That's

24   the standard set forth in the administrative exemption.

25   That's separate from whether the primary duty includes the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   performance of office or nonmanual work.

2            With the use of the term include, the regulation

3   seems to be pointing to a lesser standard needed under the

4   highly-compensated employee regulations.  More specifically

5   in the regulations -- one moment, please.

6            I will just quote from 541.601:  An employee with

7   total annual compensation of at least $100,000 is deemed

8   exempt under Section 13(a)(1) of the act if the employee

9   customarily and regularly performs any one or more of the

10  exempt duties or responsibilities.

11           If you turn to 29 CFR 541.701, the phrase -- and

12  I'll read from this section -- the phrase customarily and

13  regularly means a frequency that must be greater than

14  occasional but which of course may be less than constant.

15  Tasks are work performed regularly and customarily includes

16  work normally and were currently performed every work week.

17  It does not include isolated or one-time tasks.

18           Ms. McCutchen in her direct testimony at paragraph

19  68 includes her opinions about the meaning of the term

20  customarily and regularly.  But even if postal inspectors --

21  if the Court finds that office or nonmanual work is not the

22  primary duty of postal inspectors, certainly the fact that

23  they do have an office, they do go into an office and do

24  office-type work, they do investigative work that's not

25  manual labor customarily and regularly every work week, that

78

1    certainly should put them under the highly-compensated test

2    if the standards that includes such work customarily and

3    regularly done.

4           Similarly with respect to the discretion and

5    independent judgment analysis, if the Court finds that the

6    postal inspectors do not fit within the administrative

7    exemption analysis, they would certainly fit within the

8    highly-compensated employee analysis under an analysis of

9    whether the work that they do fits under the customarily and

10   regularly section.

11          Now, the plaintiffs ask to split up the closing

12   arguments.  I am not sure if the Court now wants Mr. Beins

13   to discuss the good-faith defense.

14          THE COURT:  Well, you have got the burden, so why

15   don't you go first on that.

16          MR. AXE:  Yes, Your Honor.  In the October 2011

17   order the Court found that genuine issues of material

18   fact -- before I go into that, Your Honor, I just want to

19   check my notes to make sure I have nothing additional on the

20   other issues.  Oh, briefly if I could touch on some quick

21   responses to plaintiff's argument.  The Mullins case was

22   raised by plaintiff's argument.  It was already briefed.  I

23   will just remind the Court that it's a first-responder case

24   under 541.3(d) and it deals with the executive exemption.

25          The plaintiffs allege that the Postal Service is

1  being disingenuous in dismissing the health and fitness

2  requirements.  The Postal Service and Postal Inspection

3  Service acknowledge the existence of those rules.  They are

4  there for a reason, but that doesn't play a significant role

5  in the analysis under the FLSA as to what they actually do.

6  But certainly there is an interest in the Postal Inspection

7  Service to make sure that to the best that they can, they

8  ensure that they have the physical fitness so that they can

9  do the duties that are required at some point sometimes.

10         I did want to address one other issue on the

11  significance briefly.  This came up at trial briefly.  The

12  question was asked of Inspector Verrochio why postal

13  inspectors investigate child pornography cases, why they

14  investigate narcotics cases.  It was asked of Mr. Gutierrez.

15  I think he answered fairly forcefully with respect to the

16  connection of the Postal Service to those cases.

17         But I will just cite for the Court in the

18  inspection service manual there is a section that talks

19  about child pornography, Section 5-5.3, Exhibit 269, page

20  267.  The connection child pornography has to do with the

21  use of the mail.  And even more directly going to the lower

22  part of that page 5-5.4.1 with respect to prohibited

23  mailings of narcotics, the section states:  The objectives

24  of the prohibited mailings narcotics program are to reduce

25  the mailing of illegal narcotics, dangerous drugs and their

80

proceeds, to ensure the safety of the Postal Service

employees, and to protect the nation's mail system from

criminal misuse.

Any assertion that any program area done by the

Postal Inspection Service that there is no connection to the

Postal Service, there is simply no evidence to support that

kind of assertion.

Before I go into the good-faith defense, I did

want to do a couple more things, Your Honor.  First, I would

like to list some exhibits for the Court's reference that

support the arguments that we have made.  Exhibit 6 is a

field operations handbook from the Department of Labor.  It

states that postal inspectors who have as their primary duty

the performance of work directly related to the general

business operations of the USPS qualify for the exemption as

long as they meet the other tests.

Exhibit 12, the Department of Labor opinion letter

stating that school resource officers perform office or

nonmanual work because a typical day consists of working in

an office or doing nonmanual work out of the office.  And

the field work they do is incidental to their primary duty.

Exhibit 119 is the direct statement by Mr. Nigg to

the MSPB that he performs office and nonmanual work and

exercises discretion and independent judgment.  I believe

Mr. Nigg explained that he was quoting the provision, a

81

1    piece of paper that constitutes the exhibit does not say I

2    disagree with this.  In fact, it documents as I assert the

3    following to be true.

4         Exhibits 150 to 151 identify the goals and

5    objectives of the Postal Inspection Service demonstrating

6    how they do work that is significant to the Postal Service.

7         Exhibit 241 is the latest annual report of the

8    Postal Inspection Service which sets forth the program areas

9    of the inspection service along with statistics and

10   descriptions.  Your Honor, we would contend that to the

11   extent that the Postal Inspection Service annual report

12   includes pictures of postal inspectors making arrests,

13   trying to recruit people, that's not relevant with respect

14   to an FLSA analysis of what they actually do.

15        Exhibit 253 is the letter from Mr. Nigg to Scott

16   Jones of the Postal Service containing his recommendations.

17   Exhibit 256 is the national communication Mr. Nigg had a

18   hand in writing containing a summary of the significant work

19   that he did for the Postal Service.  And exhibit 257 is the

20   printout of Mr. Nigg's job evaluations, including his own

21   summary about his performance.

22        Now I will move back to the good-faith defense.

23   Your Honor, in the Court's October 2011 order, the Court

24   found that genuine issues of material fact exist as to

25   whether the primary duties of postal inspectors have changed

1   such that the 1976 opinion letter is no longer controlling.

2   On that basis the Court determined that it could not

3   conclude as a matter of law that the Postal Service's denial

4   of overtime pay was in conformity with the 1976 opinion

5   letter.

6           The Court has now had a full trial on the issue,

7   and here is the disputed evidence.  In 1976 the Department

8   of Labor classified all postal inspectors as nonexempt.

9           THE COURT:  Exhibit 117, page 3.

10          MR. AXE:  I'm sorry, Your Honor?

11          THE COURT:  Exhibit 117, page 3.

12          MR. AXE:  Thank you, Your Honor.

13          Now, there hasn't been a lot of discussion about

14  this during the course of the trial, but the fact is that

15  the plaintiffs in this case are not just Level 13s.  They

16  are Level 13s and below.  We know from the DOL opinion

17  letter that position descriptions and the submission letter,

18  position descriptions for all levels of postal inspectors

19  were included to the Department of Labor, and the Department

20  of Labor found that postal inspectors at all levels met the

21  test.

22          I would like to show the Court the position

23  description in 1972 for the postal inspector A, which, as

24  the Court can see through I believe the direct testimony of

25  Mr. Milarski and Ms. Goldman, is the equivalent today of the

 1    level nine.  This is Exhibit 275 at page 1.  The document

 2    reviewed by the Department of Labor noted that the level A

 3    postal inspector conducts routine not complex, mind you,

 4    because Exhibit 208, which is the postal inspector D

 5    position description, states that they conduct and direct

 6    complex criminal, civil, and administrative investigations.

 7    That was 208, page 1.

 8           So back to 275, page 1.  They conduct routine

 9    criminal, civil, and administrative investigations and audit

10    inspections independently.  They assist experienced

11    inspectors in more difficult criminal, civil, and

12    administrative investigations and audit inspections.  They

13    develop facts for administrative consideration or evidence

14    leading to the prosecution or other successful resolution of

15    matters developing within an assigned area of

16    responsibility, and analyze and evaluate postal operations

17    of a minor nature and recommend improvements to management.

18           So while we had a lot of testimony about how much

19    approval a Level 13 has to get from his supervisor and what

20    level of discretion, I would note for the Court that the DOL

21    opinion letter is clear that all the way down to the most

22    rookie of postal inspectors -- and the testimony is clear

23    that Level 9s, Level 11s, Level 12s, Level 13s, all do the

24    same thing.  I believe that's in plaintiff's direct

25    testimony, and I believe we cited it at least in some of the

1    deposition designations.  There is no dispute that all of

2    them are part of this collective action.

3            So you go to that baseline, and you see the

4    Department of Labor looked at that position description and

5    made a determination that those folks are exempt, certainly

6    the 13s who have much greater discretion.  Should be no

7    question that they are exempt.

8            Now, sometime after 1996 the program assignment

9    for a minority of postal inspectors changed when the audit

10   function was transferred to the OIG.  We discussed before

11   there is no evidence that the Department of Labor's 1976

12   opinion was based on an assumption that the audit function

13   was the sole reason for determining that postal inspectors

14   were administratively exempt.

15           There is no evidence in the record that the Postal

16   Service negligently, willfully had a belief that audit was

17   the main reason that all inspectors were found exempt yet

18   ignored that.  This goes to the issue of whether they were

19   entitled to rely on the letter.  So if the Court does

20   believe as it opined in its summary judgment order based on

21   the limited evidence that it wasn't unreasonable for DOL to

22   assume that audit was a function that was done by all postal

23   inspectors, and it wasn't unreasonable for them, although

24   the evidence now seems to indicate that this wouldn't have

25   been likely, but it wasn't unreasonable for them to assume

1  that that was the only function that was administratively

2  exempt and nothing else was.

3          From the Postal Service's perspective it couldn't

4  be unreasonable for them to assume, knowing the facts that

5  they did definitively as to the how the operation worked,

6  that only a small percentage did audits; that when they got

7  this letter back, they said, great.  Everybody is exempt --

8  the auditors, the security teams, the criminal

9  investigators, the miscellaneous people who do all three of

10  the tasks; the people in Tulsa, Oklahoma, like Mr. Nigg in a

11  two-person office, starting with one other inspector who has

12  nine months on him; the people in the big offices doing

13  specializations.  They are all exempt, and we have the 1976

14  opinion letter to prove it.

15          DOL, in fact, was made aware both by Inspector

16  Nigg and one of its district directors, who happened to be

17  plaintiff's expert, of the claims raised by plaintiffs in

18  this case.  And they took no action against the Postal

19  Service which continued to classify all postal inspectors as

20  administratively exempt.

21          So we know that the Postal Service was on notice

22  of the claims made by Mr. Nigg, and we know the DOL was

23  technically on notice as well.  Since 1976 the Postal

24  Service has conducted position classification reviews of the

25  postal inspector position, and nothing has reasonably led

1    them to believe that the postal inspector position was no

2    longer exempt from the overtime provisions of the FLSA.

3         The direct testimony of Mr. Milarski and

4    Ms. Goldman is now in the record.  Now, to establish a

5    good-faith defense, an employer must show that it acted in

6    good faith in conformity with and in reliance on a written

7    ruling from the DOL's Wage and Hour administrator.

8         The good-faith test contains an objective test

9    that asks whether the employer in acting as he did and in

10   relying on the ruling acted as a reasonably prudent person

11   would have acted under the same or similar circumstances.

12        The Portal Act and its regulations strongly imply

13   that an employee who relies on and conforms to an opinion

14   letter which specifically addresses him and his

15   circumstances is acting in good faith.  The case that states

16   that is the Frank case, 950 F2d at 598 to 599, citing 29 CFR

17   790.15(b) -- unless I've miscited that.  I will check with

18   Ms. Hull.

19        The Postal Inspection Service is therefore

20   entitled to a good-faith defense to liability.  This defense

21   bars liability even if the written ruling is subsequently

22   determined by a Court to be invalid.  In 1976 the chief

23   postal inspector requested that written ruling from the Wage

24   and Hour administrator on the exact issue that is being

25   litigated here; namely, whether postal inspectors are exempt

1    under the administrative exemption.

2            In response Wage and Hour issued its letter

3    finding them all exempt.  That opinion letter has not been

4    rescinded or overruled by any Courts.  For over 30 years the

5    Postal Service has relied in good faith on this letter and

6    continuing to classify postal inspectors as exempt

7    administrative employees.

8            There was no evidence that the job duties of

9    postal inspectors doing criminal investigative work changed

10   from the '70s to the '80s to the '90s to today.  There is no

11   evidence that the discretion and independent judgment given

12   to those employees changed from the '70s to today.  There is

13   no evidence that the level of physicality of the job changed

14   to today.  There is no evidence that the significance of the

15   work done by them changed to today.

16           The only evidence is this removal of the audit

17   function.  And if the Court finds that that wasn't the sole

18   factor for the basis of the administrative exemption, then

19   there is no case here.  And if the Court finds that that was

20   the significant factor and the other functional areas do not

21   meet the administrative exemption, there is no evidence that

22   the Postal Service would have, should have, or could have

23   had any knowledge of that in relying on this letter.

24           Now, plaintiff's own expert admitted in his

25   testimony that it was reasonable for the Postal Service to

1   rely on the DOL opinion letter in 1976.  If it was

2   reasonable for them to rely on it in 1976 at a time when it

3   had the facts as we discussed, then it would be reasonable

4   today.

5         The evidence in the record establishes that postal

6   inspectors who performed an audit assignment when

7   transferred to a new assignment carried with them the same

8   skills and knowledge base that they had and applied those

9   skills and knowledge base to the new assignment.  The postal

10  inspectors who did the audit function had to meet the same

11  physical requirements as the postal inspectors who did not.

12        They all carried handguns.  They all received the

13  same training.  There was no general retraining needed for

14  those who were in the audit assignment other than what one

15  would expect in any transfer from a program area.

16        There was one program description, position

17  description, for the postal inspectors.  And as the Court

18  has observed, Mr. Van der Merlen testified that postal

19  inspectors performing audits had less discretion and

20  independent judgment.  Let's be fair and say the same or

21  less as those who did criminal investigative work or

22  security work.

23        THE COURT:  Well, he clearly suggested less.

24  Where you have a system where an auditor has to follow an

25  audit plan and the plan is drafted such that every competent

1    person would come out with the same answer, not much

2    discretion there.

3            MR. AXE:  I agree, Your Honor.  I am not sure as

4    an entity you want to make that assertion because we do have

5    an Office of Inspector General, and who knows what kind of

6    FLSA case might come down the line for them.  But we'll at

7    least assert that it was the same or less.  But you're

8    right.  The evidence does indicate and it's undisputed that

9    with respect to the checklist that they followed and the

10   audit programs that were handed down by the national

11   headquarters that they did have less discretion in their

12   duties.

13           With respect to the other factors, if one were to

14   look at postal inspectors who were under the audit program,

15   their ability to make the recommendations we believe is what

16   would have put them and did put them under the

17   administrative exemption.  That's why there has to be an

18   analysis of more than just a limited amount of work that is

19   being done by -- more than a finite look at the position

20   description of work that's being done.

21           For example, you could have two different kinds of

22   auditors.  You could have an auditor that just answers a

23   bunch of questions like a census worker and turns it in to

24   someone else.  You could have an auditor, though, like the

25   postal inspectors were, who did the set work that was done

90

1    and then took it back and analyzed it and decided, here are
2    the recommendations that we need to make.  That's what all
3    the postal inspectors do.
4             Security teams do that.  They will go out to a
5    facility.  They will review it, as Mr. Van der Merlen
6    testified, and then they will make recommendations.  Postal
7    inspectors who do criminal investigative work, sure, they go
8    and they talk and they interview a witness that they see at
9    the crime scene.  But they do more work beyond that using
10   their discretion and independent judgment, and then they
11   make recommendations based on that.
12            We would contend that's where the line gets drawn.
13   Do you do more than just the rote manual work.  If postal
14   inspectors were just manual workers who are sent out to go
15   take a statement, come back, type it up, and walk away from
16   it, I think this would be a much weaker case, Your Honor.
17   But that's not what the job of a postal inspector is.
18            Your Honor, if I could have a moment to confer
19   with my co-counsel, I think that's all I'm going to have.
20            (Defense counsel conferring)
21            MR. AXE:  One last thing, Your Honor.  Plaintiffs
22   reference 541.203(j), the discussion about public sector
23   inspectors.  Ms. McCutchen addressed this in paragraph 78 of
24   her declaration.  Postal inspectors are not egg graders.
25   They do not go out and put a stamp on an egg that says this

1    is A, this is AA.  This fails.  That's what a public sector

2    inspector is.  I would assume the Court would not confuse

3    the fact that the job title is postal inspector as opposed

4    to postal criminal investigator with respect to the

5    analysis.

6              If the Court has no further questions, I'll defer.

7              THE COURT:  No.  Thank you.

8              MR. AXE:  Thank you, Your Honor.

9              THE COURT:  Let's take ten minutes.

10             (Recess.)

11             THE COURT:  Mr. Beins.

12             MR. BEINS:  Thank you, Your Honor.

13             THE COURT:  Let me ask you a couple of questions.

14   Is there any issue as to the validity of the 1976 letter on

15   the date issued?

16             MR. BEINS:  As of what date?

17             THE COURT:  As of the date it was issued.

18             MR. BEINS:  As of 1976 or whatever date that was

19   in 1976.  When you say valid -- and I was going to get to

20   that, but we can jump in.  The validity is really a question

21   of law.  It wasn't proper frankly for Mr. Wiley to say it

22   was valid or invalid in 1976.

23             One of the things I would ask Your Honor to

24   consider is that looking at the Wage and Hour Act opinion

25   letters since 1976, in fact starting in the late '90s and

1    coming forward, if you look at the last paragraph -- and

2    Mr. Wiley did talk about that -- what it says now is that

3    this letter is only as good as the information you gave me

4    because, remember, this is an ex parte exercise.

5           There is no opposing counsel saying, hey, wait a

6    second, those facts are wrong; that classification is

7    incorrect; the primary duty is really this instead of that.

8    There is none of the give-and-take of a courtroom.  It's

9    simply one lawyer going to presumably another lawyer at the

10   Department of Labor back then and giving them some

11   information.

12          We don't note on this record what information was

13   given to the Department of Labor in 1976.  It's just

14   completely absent.

15          THE COURT:  Was it valid on the date it was

16   issued?

17          MR. BEINS:  When you say valid, Your Honor, I will

18   say this:  We are not going to take the legal position in

19   this litigation here today that it was invalid in 1976, but

20   I would ask Your Honor to consider the things I just said in

21   giving it weight.

22          THE COURT:  Is there any issue that the Postal

23   Service relied upon that letter in declining to pay

24   overtime, the subsequent issuance of the letter?

25          MR. BEINS:  No.  There is absolutely no evidence

1  in the record whatsoever that the Postal Service relied on

2  that letter, and that was going to be the focus of my

3  presentation.

4          THE COURT:  So the real issue then, are there

5  changed circumstances such that it would not be reasonable

6  as the regs define a reasonable person to continue to rely

7  upon the letter?

8          MR. BEINS:  That's the second issue.  The first

9  issue is did they rely on the letter.

10         THE COURT:  Well, I studied it.  You told me that

11  they in fact relied on the letter.  Is there evidence that

12  at any point in time the Postal Service said we are not

13  relying on this letter in declining to pay overtime?

14         MR. BEINS:  I would say that conversely, Your

15  Honor.  There is no evidence in this record that the Postal

16  Service relied on the 1976 letter in not paying the postal

17  inspectors overtime.  That's number one.  And even if they

18  had, number two is even if they had, the change in facts and

19  the change in the law made it no longer reasonable for them

20  to rely on it.  If I could start with the first point, Your

21  Honor.

22         THE COURT:  Please.

23         MR. BEINS:  If you look at the only evidence in

24  the record on what the Postal Service relied on, you are

25  looking at really two witnesses -- Milarski and Goldman.

1   Goldman simply doesn't mention the 1976 letter at all.

2   Milarski says at paragraph 25 that:  To the best of my

3   knowledge and based on my review of the records in the

4   official course of business of the Postal Service, the

5   Postal Service has relied in good faith on the Department of

6   Labor's 1976 letter.

7            That's it.  That's all the evidence they have.

8   It's conclusory.  It states no facts upon which this Court

9   can make a finding that in fact the Postal Service relied on

10   the 1976 letter.  In support of that --

11            MR. AXE:  I hate to interrupt.  I would ask that

12   he read the entire paragraph, or I can come up and read the

13   entire paragraph.

14            THE COURT:  You're going to get a rebuttal on the

15   good-faith issue.

16            MR. AXE:  Thank you, Your Honor.

17            MR. BEINS:  And, Your Honor, I will submit the

18   entire paragraph, but there is nothing in there that says

19   the Postal Service relied on the 1976 letter.  It's simply

20   not there.

21            If you look at the Wong case that we submitted to

22   the Court, 749 F.Supp. 2d, 1009, it was out of the Northern

23   District of California, September 2010.  The circumstances

24   are remarkably similar in that case as to this case.  In

25   that case a bank lawyer requested an opinion letter from the

1    Department of Labor.

2            The bank lawyer received the opinion letter from

3    the Department of Labor.  That is where the evidence stopped

4    in the litigation, and the Court says on page 1020 that the

5    bank -- in that case HSBC Mortgage Corporation -- offers no

6    evidence that the lawyer recommended, based on her review of

7    the opinion letter or any other DOL document, that HSBC

8    classify all or any of its loan officers -- that was the

9    employee in that case -- as exempt.  Nor does HSBC offer any

10   evidence that the individuals who made the classification

11   decision ever reviewed the opinion letter, let alone took

12   any action in reliance thereon -- and this is my addition --

13   as required by U.S. Code 29, Section 259.  There has to be

14   actual reliance and there has to be proof of actual

15   reliance.

16           THE COURT:  But the chronology tells us that the

17   request was focused on a specific job; answer given, exempt;

18   and thereafter the Postal Service has not paid overtime.

19   Isn't that sufficient to infer that the letter caused them

20   not to pay overtime and to continue not to pay overtime?

21           MR. BEINS:  No, Your Honor.  You need actual

22   reliance.  There is a lot of law around the country in

23   various contexts what actual reliance means and the proof

24   that's required to prove actual reliance.  And, of course,

25   it's the Postal Service that must prove that fact that in

1  fact they actually relied on the 1976 letter in not paying

2  Mr. Nigg and everyone else FLSA overtime.

3  There is also an objective part of the test, and

4  I'll move on to that if I could.  Even if there had been

5  proof of reasonable reliance on the 1976 letter, coming

6  forward we have the change in circumstances with the audit,

7  and I'll come back to that.  But the clear demarcation, the

8  clear line of demarcation, is 2004.  There you have a very

9  clean departure from the past in that you have 541.3(b) that

10  expressly removes law enforcement officers and other -- and

11  actually the code, the regulation and the preamble refers to

12  it as public safety employees.  Over time the public safety

13  employee exemption has kind of morphed or been described as

14  the first responder exemption, but they are talking about

15  the same exemption.

16  So if you look at that exemption on its face, that

17  raises a question that should have caused the Postal Service

18  to make further inquiry.  They did not.  There is complete

19  absence of that in the record.

20  In fact, if you look at the 2005, October 14,

21  2005, opinion letter from the Department of Labor, it deals

22  specifically with the applicability of the 541.3(b) to

23  higher-ranking law enforcement officers.  In that case they

24  were talking about police officers at lieutenant or above --

25  police captains, police lieutenants.  And they were also

1    talking about a fire battalion chief.  So they were talking

2    about in that case in this instance the highest-ranking

3    police and fire officials -- first responders or public

4    safety employees.

5              If you look at page 2 of that opinion letter, the

6    Department of Labor is very instructive on this point.

7    First they say --

8              THE COURT:  What's the exhibit number, please.

9              MR. BEINS:  It was filed.  It's law that was filed

10   last night as additional law in the case along with the Wong

11   decision.  I have an extra copy, Your Honor, if I could

12   approach.

13             THE COURT:  Why don't you hand it up because I

14   haven't seen it.

15             MR. BEINS:  Your Honor, if I may.

16             THE COURT:  Please.

17             MR. BEINS:  Your Honor, looking at page 2, the

18   first paragraph, they say -- and I will paraphrase, but

19   revised 541.3(b) says what it says.  And they just basically

20   quote the regulation.  Then the next sentence says:  Thus

21   such employees do not qualify for an exemption as an

22   executive or administrative employee under Section 541.100

23   or Section 541.200.  The next sentence says:  In fact, they

24   also do not meet the test for the professional exemption

25   under 541-300.  Now --

```
 1              THE COURT:  Who is this issued to?

 2              MR. BEINS:  It's not clear, Your Honor, but it's

 3    published on Westlaw.  I mean, it is instructive.  In fact,

 4    the regs and the code talk about the various weight to be

 5    given to the Department of Labor letter.

 6              THE COURT:  Is there any evidence that this

 7    opinion letter ever came to the attention of the Postal

 8    Service?

 9              MR. BEINS:  Well, it's publicly available.

10              THE COURT:  No.  No.  Is there any evidence that

11    this letter in fact came to the attention of the Postal

12    Service?

13              MR. BEINS:  No, not in this record, Your Honor.

14    Correct.

15              THE COURT:  So I am to infer that a letter where

16    there is no evidence that they saw affects that there's

17    either subjective or objective reliance on the 1976 letter?

18              MR. BEINS:  Well, if you remember how this came

19    about, it's the change in the regulation 541.3(b) that

20    clearly should have put them on notice.  I have no evidence

21    that a lawyer at the Postal Service picked up the 2004 reg

22    and read it, but I think you're on notice of that which is

23    publicly available.  Likewise, with regard to the Department

24    of Labor letter that interprets the recently revised

25    addition to 541, which would be 541.3(b).
```

99

```
 1              If you can go one more paragraph, the Department
 2     of Labor actually -- and excuse my parlance -- throws a bone
 3     back to the various employers.  That is, they say even
 4     though 541.3(b) says that regardless of rank, if you do
 5     these duties, you're carved out of the exemptions, all three
 6     exemptions.
 7              It does suggest that if you move high enough up
 8     the hierarchy, you can still be exempt even if you do the
 9     duties within 541.3(b).  But they say that the exemption
10     that would apply in that instance would be the executive
11     exemption, and that's why I believe if you look at the
12     Mullins case that came out after this change in the
13     regulation and after this interpretation by the Department
14     of Labor, in that case they were dealing with sergeants, New
15     York City Police sergeants.
16              Your Honor asked a question of Mr. Osborn earlier
17     about a hybrid situation where you have clearly some
18     supervisory duties and then you have some frontline law
19     enforcement duties, what's one to do with that problem?  The
20     Mullins case dealt with that problem at the trial level.
21     They actually ruled for the City of New York, and at the
22     Second Circuit they reversed and granted judgment as a
23     matter of law to the sergeants.
24              But the instructive point I think in that case is
25     that both sides agreed that the administrative exemption
```

1    didn't even apply, and I believe that's because of this reg

2    and because of 541.3(b).  So it wasn't even litigated in

3    that case because both parties conceded that point.

4              You'll see also on page 3 of that letter, just to

5    give Your Honor a sense of what the new form from the

6    Department of Labor was, the last paragraph of that letter

7    has the boilerplate language that's in all of the opinion

8    letters that I have seen in the last ten years or so.  And

9    just to read the first bit:  This opinion is based

10   exclusively on the facts and circumstances described in your

11   request.  It is given on the basis of your representation,

12   expressed or implied, that you have provided a full and fair

13   description of all the facts and circumstances that would be

14   pertinent to our consideration of the questions presented.

15             So that would be one of our criticisms of the 1976

16   letter, that even though that language wasn't in the letter,

17   implicit is that the letter itself is only as good as the

18   information that went into the letter.  We have no idea what

19   that was.

20             I would add, Your Honor, that the 1976 letter has

21   made a recent appearance in this case, so that's another

22   factor that you can consider.  You know, it was only a

23   couple of months ago that the Postal Service even asserted a

24   defense under the 1976 letter.  And -- there is some dispute

25   perhaps -- and there is no mention of the 1976 letter at all

1  until about a year ago, was I think the discussion that

2  occurred in open court.

3      So the Postal Service filed an answer years ago

4  and never mentioned this document.  And now within the last

5  year they have now said all along the reason we haven't been

6  paying overtime is because of this 1976 letter.  You can

7  weigh that as you will, Your Honor.

8      Last, I would like to point out the reason why we

9  put in the Nigg MSPB, the merit system protection board,

10 documents was to argue the judicial estoppel rule.  And we

11 talked about that at some length both at summary judgment

12 and in passing up until this point.  I won't go back there

13 again.  We submit on the arguments already made on judicial

14 estoppel.

15     But the important factor there again, even if you

16 look at that as evidence of the Postal Service's actual

17 reliance on the 1976 letter, in all those exchanges between

18 Mr. Nigg and the Postal Service, not once did the Postal

19 Service mention the reason we are not paying you overtime is

20 because the Department of Labor said in 1976 that we don't

21 have to.  Again, evidence that there is no actual reliance,

22 and it's not our burden to show that.  But to the extent

23 that even there was some evidence -- and there is none --

24 you could weigh that against the evidence that suggests that

25 some evidence is outweighed by the overwhelming evidence

1   they didn't actually rely on the 1976 letter.

2            Your Honor, that completes my presentation unless

3   you have any questions.

4            THE COURT:  No.  Thank you.

5            Why don't we take the lunch break.  Mr. Osborn,

6   you are entitled to rebuttal on the exemption issue.  The

7   government is entitled to rebuttal on the good-faith issue.

8            MR. OSBORN:  I have about five minutes, Your

9   Honor.

10           THE COURT:  Well, let's do that.  Then we will

11  take the lunch break and then come back.

12           Mr. Osborn.

13           MR. OSBORN:  Thank you, Your Honor.  I made some

14  comments in my opening remarks about presentation letters

15  and the fact that my recollection of the testimony was that

16  presentation letters do not include recommendations.  And

17  then there was some PowerPoint stuff shown up on the screen

18  afterward.

19           I believe my statement was limited to presentation

20  letters, and the stuff that was shown went beyond

21  presentation letters.  I certainly didn't mean to mislead

22  the Court.  I don't think I did.  I think the record is

23  accurate as to the presentation letters unless I am

24  mistaken.

25           There seems to be a lot of emphasis on the

1   frequency of performing the law enforcement tasks.  Does the

2   frequency tie into directly to whether or not the

3   inspector's work is manual or nonmanual, office, non-office.

4   If the frequency of performing law enforcement tasks was the

5   barometer, then no law enforcement officer would ever be

6   entitled to overtime.

7           The fact of the matter is that you heard testimony

8   here that folks don't do it every day.  I am trying to

9   recall if there is evidence in the record that not every

10  police officer arrests somebody every day.  Not every police

11  officer chases a suspect every day.  Not every police

12  officer engages in the manual physical tasks associated with

13  law environment every day.

14          Nevertheless we know from multiple decisions that

15  that's not what the exemption necessarily turns on.  In

16  fact, if you look at Murphy, police detectives akin to

17  inspectors, are not street cops, were deemed not exempt --

18  in other words, entitled to overtime.  I'll come back to the

19  Rooney decision in a moment.

20          The Reich decision involved police investigators.

21  Again police investigators akin to postal inspectors, they

22  are entitled to overtime.  The Bratt decision, probation

23  officers, those folks are entitled to overtime.  In fact,

24  the Reich and the Bratt decisions are recited in the

25  preamble.

1            Just to put a little bit more meat on this, in the

2    Reich case the Court granted overtime pay to police

3    investigators whose duties included investigating crime

4    scenes, gathering evidence, interviewing witnesses,

5    interrogating and fingerprinting suspects, making arrests,

6    conducting surveillance, obtaining search warrants,

7    testifying in court.  That's Reich versus state of New York.

8    That's from 1993.

9            The Bratt decision, Ninth Circuit opinion from

10   1990, probation officers who conduct investigations and make

11   recommendations to the Court regarding sentencing are

12   nonexempt administrative employees.  That comes right out of

13   the preamble.

14           I mentioned Rooney a moment ago.  That's a

15   decision that granted overtime pay to deputy U.S. marshals.

16   He's not in here today, but the fellow who was sitting in

17   the back of the courtroom --

18           THE COURT:  They are not U.S. marshals.

19           MR. OSBORN:  Okay.

20           THE COURT:  They're court service officers.

21           MR. OSBORN:  In any event, deputy U.S. marshals

22   are in fact entitled to FLSA overtime despite the fact that

23   those folks are charged with -- despite the fact that their

24   law enforcement work or the physical nature of those tasks,

25   of that work, is not conducted on a daily basis.

1           Two other points, Your Honor.  The

2   highly-compensated issue, that burden falls to the Postal

3   Service under 541.601(d).  As we pointed out, there is a

4   carve-out to that test/exemption; that is, you are not

5   subject to the exemption if your primary duty includes

6   performing office or nonmanual work.  That burden falls to

7   the Postal Service.

8           I don't think there is any evidence in this record

9   that shows that postal inspectors using the language from

10  541.600 customarily and regularly perform certain

11  activities.

12          THE COURT:  Did you say that backwards?  The

13  carve-out is if you perform non-office manual, you are not

14  covered by the highly-compensated exemption.

15          MR. OSBORN:  That's correct.

16          THE COURT:  I think you said it the other way

17  around.

18          MR. OSBORN:  Okay.  Thank you, Your Honor.  The

19  government cited to Ms. McCutchen's declaration on the

20  highly-compensated.  That declaration or testimony, if you

21  will, consists of two paragraphs, paragraph 67 and paragraph

22  68.  Paragraph 67 is nothing more than a recitation of the

23  regulation.  The bulk of paragraph 68 is nothing more than a

24  recitation of the regulation.

25          She does have two sentences.  She says:  It's my

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    understanding that the Court has already held that the work

2    of postal inspectors relates to the management or business

3    operations of the Postal Service.  We don't quibble with

4    that.  But this is the sole extent of the testimony we have

5    from the Postal Service on the highly compensated as relates

6    to this carve-out, I will call it.

7            She says:  Further I do not see how it can be

8    disputed that the highly-compensated postal inspectors

9    customarily and regularly perform office or nonmanual work

10   and exercise discretion and independent judgment.  Again,

11   focus on the office or nonmanual work.  That's it.

12           I think the Court yesterday struck a similar

13   opinion that was unsupported and unsubstantiated.

14           THE COURT:  Yes, but I didn't strike it for that

15   reason.  I struck it because it wasn't in her report.

16           MR. OSBORN:  In this particular case, Your Honor,

17   I would just submit that the record is virtually void of any

18   real testimony or evidence with respect to the invocation of

19   the highly compensated or at least addressing the

20   inspectors' position that there is a carve-out and they're

21   entitled to invoke the carve-out because of the

22   nonmanual/manual.

23           THE COURT:  You're entitled to invoke the

24   carve-out.

25           MR. OSBORN:  The inspectors.  And just so I make

1  sure the record is clear, if you perform non-office, manual

2  work, you are entitled to overtime basically no matter how

3  much money you make.

4           THE COURT:  Right.  You can't invoke the

5  highly-compensated exemption.  But doesn't this record

6  permit me apart from Ms. McCutchen's declaration to make a

7  factual finding as to, A, what tasks inspectors customarily

8  perform; B, whether those tasks fall within the

9  administrative exemption; C, whether they operate with

10  discretion and independent judgment?  Can't I make all those

11  factual findings from the record itself?

12           MR. OSBORN:  I think you could, Your Honor.

13           THE COURT:  And haven't you suggested to me in the

14  discussion with regard to the administrative exemption how

15  those factual determinations ought to be made?

16           MR. OSBORN:  Yes, I have.  I am just suggesting

17  that the burden falls to the Postal Service on this

18  particular issue.  If Your Honor were to find against us on

19  the manual, non-office issue in terms of administrative

20  exemption, this would fall by the wayside and include --

21           THE COURT:  Carve-out.  No basis to invoke the

22  carve-out.  Right.

23           MR. OSBORN:  And lastly, Your Honor, and I know I

24  am repeating myself and I don't mean to preach to the Court

25  about its role, but I would remind the Court again that the

1    burden of proof here is not just a preponderance of the

2    evidence.  It's substantially higher than that.

3            Your ruling could have the effect of exempting

4    postal inspectors from a pay benefit that they are currently

5    entitled to under a congressional statute, which is the Fair

6    Labor Standards Act.  That's supposed to be a decision that

7    is exercised obviously very carefully, and I know that Your

8    Honor will do that.

9            Thank you.

10           THE COURT:  Thank you.

11           Mr. Axe.

12           MR. AXE:  Your Honor, I have two minutes on good

13   faith, but could I show the Court the exhibit from the ISM

14   that talks about presentation letters just so the Court has

15   it?

16           THE COURT:  Please.

17           MR. AXE:  This is Exhibit 269 at page 294.  In the

18   second paragraph it states:  Include all facts having a

19   direct bearing on the crime.  Do not include opinions or

20   deductions that are not supported by physical or

21   circumstantial evidence or witnesses' testimony.  It does

22   not simply say:  Do not include opinions.

23           Briefly with respect to the question about actual

24   reliance.  We obviously, as the Court noted, have a letter

25   directly from the Postal Service to the Department of Labor

1   and a letter directly from the Department of Labor to the

2   Postal Service.  Plaintiff's characterization that there is

3   no evidence in the record of actual reliance is simply not

4   true.

5        I will read paragraph 25 completely of

6   Mr. Milarski's direct testimony.  Plaintiffs chose not to

7   cross-examine Mr. Milarski.  Quote:  To the best of my

8   knowledge and based on my review of records kept in the

9   official course of business of the Postal Service, the

10  Postal Service has relied in good faith on the Department of

11  Labor's 1976 opinion letter in classifying postal inspectors

12  as FLSA exempt.  In conformity with this ruling by the

13  Department of Labor, the Postal Service has never paid

14  postal inspectors FLSA overtime.

15       In the direct testimony of Mr. Belz, paragraph 26:

16  During my tenure on the pay task force, I reviewed a 1976

17  letter from the Department of Labor determining that postal

18  inspectors were administratively exempt from the provisions

19  of the Fair Labor Standards Act.  Certainly we have the two

20  federal court cases.

21          THE COURT:  What's the paragraph?

22          MR. AXE:  Paragraph 26.

23          THE COURT:  Of Belz.  Okay.

24          MR. AXE:  Yes, Belz.  We have the court cases

25  where the DOL opinion letter was discussed significantly.  I

1   will just refer the Court to paragraphs 24 to 27 of

2   Ms. McCutchen's declaration where she sets forth her

3   opinions about the good-faith defense and about how in your

4   opinion the Postal Service did actually rely.

5           THE COURT:  Well, isn't the fact that the Postal

6   Service defended Sprague and Dymond evidence of reliance at

7   least through the dates of those decisions?

8           MR. AXE:  One would think, Your Honor.  Yes.

9           THE COURT:  Okay.

10          MR. AXE:  I have nothing further unless the Court

11  has questions for me.

12          THE COURT:  Mr. Beins took the view that the

13  change in law with respect to 541.3(b), the first

14  responders, would have caused a reasonable person to

15  question the continued validity of the letter.  What's your

16  response?

17          MR. AXE:  Your Honor, in the direct testimony of

18  Ms. Goldman, she sets forth the chronology of the position

19  reviews that were done by the Postal Service.  If we had a

20  situation where the Postal Service never looked at

21  positions, never did classification reviews, perhaps the

22  plaintiffs could argue that the Postal Service took a blind

23  eye to the position descriptions.  But the undisputed

24  testimony of Ms. Goldman was that on numerous -- several

25  occasions the Postal Service, including in 2004 and 2006,

 1  looked at these position descriptions through the course of

 2  their official duties and did not change the FLSA exempt

 3  status.

 4          We do have an exhibit in the record that lists the

 5  positions of the Postal Service that were changed of their

 6  FLSA exempt status, and the postal inspector position is not

 7  listed there.  I see Ms. Hull looking so we can tell you

 8  exactly which trial exhibit unless the Court has that in

 9  front of you.

10          THE COURT:  No.

11          MR. AXE:  It's Exhibit 263, Your Honor.  It's a

12  listing of the conversions positions from FLSA exempt to

13  FLSA nonexempt status in 2004 during the course of the

14  review.  There is a postal service-wide review, as I recall.

15  Just one moment, Your Honor.

16          (Defense counsel conferring)

17          MR. AXE:  Two quick notes.  On page 2 of Exhibit

18  263 there is a position titled fingerprint technician, and

19  in parentheses is the notation IS, which is an indication of

20  an inspection service position.  So the record shows that

21  inspection service positions, at least that one, was

22  reviewed.  The testimony is that there was a systemwide

23  review of all positions, and postal inspection positions

24  were not changed at the time.

25          THE COURT:  Who speaks to this 2004 review?

1          MR. AXE:  I believe this was with the testimony of

2   Ms. Goldman.  This is her exhibit.  Again, plaintiffs chose

3   not to cross-examine her.

4          And then finally with respect to the issue of

5   should the regulations in 2004 put the Postal Service on

6   notice, I believe the Court has already found that the

7   Department of Labor did not indicate that there should be a

8   change in the law.

9          THE COURT:  Right.

10         MR. AXE:  But whether it had any effect -- we

11  don't have any evidence one way or the other that someone

12  read the change in the regulations and then decided to go

13  look up the positions again.  But we do know that regularly

14  at that time and again in 2006 reviews were conducted.

15         THE COURT:  Well, the Court has concluded on

16  summary judgment that 541.3(b) does not provide overtime pay

17  for postal inspectors.  So the Court -- if that's the

18  Court's legal conclusion, it's hard for me to see how

19  adoption of a regulation that the Court has found is

20  inapplicable would create a basis for a reasonable man to

21  question the validity of the original 1976 letter.

22         MR. AXE:  Yes, Your Honor.  We agree.

23         THE COURT:  Okay.  Then we'll resume --

24         MR. BEINS:  Could I respond in ten seconds, Your

25  Honor, to one point?

1          THE COURT:  Ten seconds.

2          MR. BEINS:  Your Honor, Mr. Axe directed you to

3    paragraphs 9 and 10 of Ms. Goldman's declaration.  I am not

4    going to read them to Your Honor, but I ask that you read

5    them.

6          THE COURT:  Let me get them in front of me,

7    please.

8          MR. BEINS:  As you are reading, I will just

9    indicate there is nothing in paragraph 9 or 10 that

10   indicates that the Postal Service actually relied on the

11   1976 letter, which was the point we were arguing.  In fact,

12   Ms. Goldman says the review that even affected postal

13   inspectors wasn't done by her.  It was done by someone else.

14   We don't even know who that is.  That's the extent.

15          Nothing further.  Just that one point, Your Honor.

16          THE COURT:  Okay.  Thank you.  Then we will resume

17   at 1:30.

18          (Lunch recess.)

19          THE COURT:  I am prepared at this time to enter my

20   oral findings of fact and conclusions of law with respect to

21   the remaining issues.

22          Number one, is the Postal Service entitled to the

23   administrative exemption with respect to postal inspectors?

24   Two, does the highly-compensated exemption apply to postal

25   inspectors?  And, three, is the Postal Service entitled to

1    the good-faith exception?

2              In coming to these findings of fact and

3    conclusions of law, I have considered all the written

4    testimony that was filed.  I have considered the live

5    testimony and cross-examination.  I have considered the

6    extensive documents that the parties have filed.  I have

7    reviewed and considered the parties' proposed findings of

8    fact and conclusions of law, and I have considered the

9    arguments made by the parties in closing.

10             Let me provide some brief comments by way of

11   overview in the Court's summary judgment orders.  The Court

12   has discussed the background of this case in detail, and I

13   will not repeat that.

14             This action is brought to enforce the Fair Labor

15   Standards Act beginning in 29 United States Code section

16   2001.  The Court has jurisdiction over the claims.  As a

17   matter of federal question jurisdiction, 28 USC Section

18   1331; and as a matter of the Postal Service being a party,

19   39 United States Code Section 409(a).  The action is brought

20   as a collective action under Section 216 of Title 29.

21             Certain facts were admitted by the parties in the

22   pretrial conference order, and certain other facts by way of

23   assertions of the plaintiff have been established without

24   controversy.

25             The parties in the pretrial conference order have

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  admitted the United States Postal Service is an employer as

2  defined by the Fair Labor Standards Act.  Postal inspectors

3  employed by the United States Postal Service are employees

4  as defined by the Fair Labor Standards Act.  Plaintiffs are

5  compensated on a salary or fee basis at a rate of not less

6  than $455 per week.

7           The following facts which are labeled plaintiff's

8  assertions at page 3 and 4 of the pretrial conference order

9  have in fact been established by a preponderance of the

10  evidence.

11           One, the United States Postal Service is an

12  employer as defined by the FLSA.

13           Two, all of the plaintiff postal inspectors are

14  employees as defined by the FLSA.

15           Three, all of the postal inspectors work more than

16  40 hours a week.

17           Four, all the plaintiff postal inspectors worked

18  an average of 50 hours a week.

19           Five, none of the plaintiff postal inspectors were

20  paid at a rate of one and one-half their regular pay for

21  hours worked over 40 hours a week.

22           Six, all of the plaintiff postal inspectors were

23  paid at their regular rate of pay for all hours worked over

24  40 hours.

25           And seven, a condition of employment of postal

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  inspectors is that they meet the annual average minimum

2  requirement of two additional hours of unscheduled work per

3  day.

4         The Court has made a number of rulings on the

5  motions for pretrial -- in the pretrial motions for summary

6  judgment that have a bearing on the remaining claims.  At

7  docket 365, minute order of October 7, 2011, the Court found

8  that 29 CFR 541.3(b) does not preclude the application of

9  the administrative exemption.  There is an extensive

10  discussion at docket 365, pages 18 to 24.

11         Although I have been invited to reconsider that

12  ruling, I believe that the basis for the ruling is

13  sufficiently articulated and I reaffirm that 541.3(b) is not

14  applicable to the postal inspectors.

15         I also held in the same order at page 14 that the

16  work of the postal inspectors relates to the work of the

17  U.S. Postal Service.

18         I turn first to the administrative exemption.  The

19  administrative exemption is provided at 29 United States

20  Code Section 213(a), which provides:  The provisions of

21  section 206 except Subdivision (d) in the case of paragraph

22  1 of this subsection, and Section 207 of this title, shall

23  not apply with respect to, one, any employee employed in a

24  bona fide executive, administrative, or professional

25  capacity.  And it goes on from there with further language

1    that's not really relevant to the considered exemption here.

2            In establishing the exemption, the burden of proof

3    rests with the employer asserting the exemption.  The

4    regulations also note at 551.202 that while established

5    position descriptions and titles may assist in making

6    initial FLSA determinations, the designation of an employee

7    as exempt or nonexempt must ultimately rest on the duties

8    actually performed by the employee.  For that reason, I

9    dwell in some length on the duties actually performed by the

10   employees.

11           In closing argument plaintiffs' counsel brought to

12   my attention the Ninth Circuit case of Bothell vs. Phase

13   Metrics, Inc., 299 F.3d, 1120, Ninth Circuit 2002.  At page

14   1124 and 1125 the Ninth Circuit makes the following

15   observation:  Because the FLSA is liberally construed to

16   apply to the furthest reaches consistent with congressional

17   direction, FLSA exemptions are to be narrowly construed

18   against employers and are to be withheld except as to

19   persons plainly and unmistakably within the terms and

20   spirit.  Citing Klem v. County of Santa Clara, 208 F.3d at

21   1089.

22           I interpret the Ninth Circuit law as not creating

23   a heightened burden of proof but rather establishing a

24   narrow view of the exemptions and a caution that the

25   exemptions are to be narrowly applied.  Within that context

1   I find that the burden of proof is by a preponderance of the

2   evidence albeit within a narrow confine.

3          The regulations promulgated by the Department of

4   Labor provide a helpful frame of reference for beginning the

5   factual analysis.  So I will quote from parts of 29 CFR

6   541.202.  First, Subparagraph (a):  To qualify for the

7   administrative exemption, an employee's primary duty must

8   include the exercise of discretion and independent judgment

9   with respect to matters of significance.  In general, the

10  exercise of discretion and independent judgment involves the

11  comparison and evaluation of possible courses of conduct and

12  acting or making a decision after the various possibilities

13  have been considered.  The term "matters of significance"

14  refers to the level of importance or consequence of the work

15  performed.

16         In Subparagraph (b), the reg goes on to further

17  address discretion and independent judgment.  The phrase

18  "discretion and independent judgment" must be applied in the

19  light of all the facts involved in the particular employment

20  situation in which the question arises.  I will examine the

21  facts by themselves, and then I will examine the number of

22  factors set forth in Subparagraph (b) that the regs suggest

23  are indicative of whether in fact an individual exercises

24  discretion and independent judgment.

25         Subparagraph (c) provides further insight and

1    reads in part:  The exercise of discretion and independent

2    judgment implies that the employee has the authority to make

3    independent choice free of immediate direction or

4    supervision.  However, employees can exercise discretion and

5    independent judgment even if their decisions or

6    recommendations are reviewed at a higher level.

7          The term discretion and independent judgment does

8    not require that the decision made by an employee have

9    finality that goes with unlimited authority in a complete

10   absence of review.

11         The decision made as a result of the exercise of

12   discretion and independent judgment may consist of

13   recommendations of foreaction rather than the actual taking

14   of action.

15         In Subparagraph (e), the reg distinguishes the

16   mere use of skill and experience.  Subparagraph (e) says in

17   part:  The exercise of discretion and independent judgment

18   must be more than use of skill in applying well-established

19   techniques, procedures, or specific standards described in

20   manuals or other sources.  It references Section 541.704,

21   which specifically notes that the use of manuals does not

22   disqualify or deny the absence of the administrative

23   exemption if the facts otherwise warrant it.

24         We have had testimony from a number of Level 13

25   postal inspectors and a number of individuals who have

1  served as both Level 13 and Level 14 postal inspectors.

2  Level 14 inspectors are supervisors and serve, among other

3  things, as team leaders.

4        The evidence in my mind presents something of a

5  mosaic.  The picture can be quite different if one isolates

6  on one particular postal inspector's experience on a given

7  day under a given supervisor.  I think my job as a fact

8  finder is to step back from the mosaic and see what picture

9  is created by the evidence when I consider all of the

10  evidence.

11        I'll take up the concept of discretion and

12  independent judgment from a common-sense standpoint, and

13  then I will turn to the factors discussed in the reg.  The

14  level of discretion and independent judgment which a postal

15  inspector at a Level 13 could exercise is dependent in part

16  upon the management style of the Level 14 supervisor.

17        There is testimony that some Level 14 supervisors

18  were, to use the popular term, micro-managers and controlled

19  the activities of the Level 13s quite closely.  There is

20  also testimony that other managers afforded the level 13

21  postal inspectors who work for them wide latitude in

22  conducting their day-to-day activities.

23        There is also a variety of experiences related by

24  the inspectors in carrying out various tasks.  It is clear

25  that to initiate a jacket -- that is, to initiate a formal

1  investigation -- the approval of a Level 14 supervisor was

2  required.  However, the testimony was virtually uniform that

3  the level 14 supervisors regularly accepted the

4  recommendations to initiate an investigation made by the

5  Level 13 postal inspectors.

6          There was testimony from Mr. Stern and confirmed

7  by Mr. Nigg that a Level 13 postal inspector could

8  independently expand an investigation.  The testimony was

9  that to close an investigation, at least in some instances,

10 approval of a Level 14 postal inspector was required.  One

11 of the major tasks is to carry out criminal investigations,

12 and part of that is to go and make a presentment to the

13 United States Attorney.

14         The testimony varied as to whether in certain

15 circumstances a Level 13 postal inspector could go directly

16 to a United States Attorney with a presentment package or

17 whether he had to go through the Level 14 inspector.

18 However, the testimony I believe is more or less uniform to

19 the effect that where approval of the Level 14 supervisor

20 was required, that they uniformly accepted the

21 recommendation of the Level 13 postal inspector.  And then

22 when changes or corrections were made in a presentment

23 package, that they were technical or grammatical but not

24 necessarily of substance.

25         One of the duties of a postal inspector is to

122

 1  initiate search warrants.  The testimony was that for

 2  certain types of warrants no approval from a level 14

 3  manager was required.  These included initiating warrants

 4  for letters and packages.  Approval was required for

 5  initiating warrants to search premises and for arrest

 6  warrants.  Again, the testimony is virtually uniform that in

 7  practice the recommendation of a Level 13 postal inspector

 8  was accepted.

 9          There is testimony that a controlled delivery, to

10  conduct a controlled delivery, permission from a Level 14

11  postal inspector was required.  The testimony was that in

12  conducting their day-to-day activities in mounting an

13  investigation, that Level 13 postal inspectors had wide

14  discretion in how they conducted those day-to-day

15  activities.  They determined in most instances who they

16  would interview without intervention of a Level 14 postal

17  inspector unless the potential interviewee was a high-level

18  person or there was some other reason to make the interview

19  sufficiently significant that it should at least be

20  presented to the Level 14 postal inspector.

21          They conducted surveillance on their own and

22  determined who to surveil.  Mr. Stern for one, and many

23  others, made similar admissions that they had a measure of

24  independence in how to conduct their investigations.  I find

25  that conducting investigations entails the consideration of

1    alternative methods and means before establishing a course

2    of action; for example, what search warrants to seek, what

3    witnesses to interview, how to conduct interviews.

4         The testimony is that Level 13 postal inspectors

5    did not make policy.  However, as I will come back to in a

6    minute, they could recommend policy and they could make

7    recommendations in general.  As the ISM manual is clear at

8    Exhibit 269, page 288, as part of their duties they were to

9    make recommendations in their reports.  As part of their

10   duties in making presentation packages to go to the United

11   States Attorney, they were permitted and encouraged to make

12   fact-based opinions.

13        Postal inspectors did not have the ability to

14   incur expenditures on behalf of the Postal Service.

15        Just taking the plain meaning of the words

16   discretion and independent judgment, I find that the postal

17   inspectors in carrying out their duties exercised discretion

18   and independent judgment.  If I turn to the factors in the

19   regulations that indicate activity reflective of discretion

20   and independent judgment, I come to the same conclusion

21   because a number of those factors are reflected in the

22   duties of a postal inspector.

23        I would further note as indicia or example of

24   discretion and independent judgment the amount of time that

25   postal inspectors spent on so-called area time.  Area time

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   is time that was not charged to any particular

2   investigation.  Only after an investigation was formally

3   opened would the time be charged to a specific account, if

4   you will.

5        At paragraphs 76 and 77, Randy Miskanic discusses

6   this concept of an area case.  At paragraph 76 he says in

7   part:  An area case is an internal Postal Inspection Service

8   term used to account for and track investigative hours in

9   specific program areas expended by inspectors in instances

10  where cases have not yet been jacketed.

11       In paragraph 77 he provides some statistics for

12  various activities:  In FY 2011 approximately 37 percent of

13  our total mail theft and identity theft case hours were

14  charged to area cases.  From the mail fraud program

15  15 percent of our investigative hours are charged to area

16  cases.

17       And he provides additional statistics for other

18  specific areas ranging from 35 to 50 percent.  This record

19  establishes that a substantial amount of an inspector's time

20  is spent on area cases.  The significance of this is that in

21  developing new cases, postal inspectors have substantial

22  discretion and exercise independent judgment in developing

23  leads and developing cases.  The fact that they have that

24  discretion was testified to by a number of postal inspectors

25  apart from the concept of area cases.

 1          Again, I find this significant in coming to the

 2    conclusion that postal inspectors exercise discretion and

 3    independent judgment.

 4          If I turn to the factors in 541.202(b), we see

 5    that a number of those factors are found in the activities

 6    of level 13 postal inspectors, and I will recite a number of

 7    those that were discussed in closing argument.

 8          One factor is whether the employee has the

 9    authority to formulate, effect, interpret, or implement

10    management policies or operating practices.  I think the

11    record adequately establishes at a minimum that level 13

12    postal inspectors implement management policies and

13    operating practices.

14          An additional factor is whether the employee

15    carries out major assignments in conducting the operations

16    of the business.  A number of the investigations that were

17    discussed during the testimony would qualify as major

18    assignments, including a number of those carried out by

19    Mr. Nigg which I will list in a minute.

20          Another factor is whether the employee performs

21    work that affects business operations to a substantial

22    degree even if the employee's assignments are related to a

23    particular segment of the business.  I think the record

24    adequately establishes that the activities affect the

25    business of the Postal Service generally, and I will discuss

126

1    some of those in a minute.

2            Another factor is whether the employee provides

3    consultation or expert advice to management.  Clearly postal

4    inspectors do that.  Some individuals are recognized as

5    subject matter area of experts as was Mr. Nigg.

6            Another factor is whether an employee investigates

7    and resolves matters of significance on behalf of

8    management.  Clearly such things as revenue loss, misuse of

9    the Postal Service facilities for any purpose, would fall in

10   the category of matters of major significance for which they

11   play a role in resolution.

12           Finally I would note the fact of whether the

13   employee represents the company in handling complaints,

14   arbitrating disputes, or resolving grievances.  We have

15   testimony that a regular function of a Level 13 postal

16   inspector is to respond to complaints from the consumer

17   public using the Postal Services.

18           I find that the activities of the Level 13 postal

19   inspectors do not amount to a mere exercise of skill,

20   training, and experience.  In order to perform the duties

21   competently and successfully, such skill, training, and

22   experience is overlaid with the exercise of discretion in

23   determining what to do and how to do it, and independent

24   judgment.

25           I find that Mr. Nigg's own description of his

1   activities in Exhibit 119 at page 6 falls squarely within

2   the definition of an individual exercising independent

3   judgment and discretion.  Paragraph 18 of the form which he

4   submitted is entitled employment status at the time of the

5   action appealed.  He wrote:  Appellant is an administrative

6   employee of the United States Postal Service whose duties

7   consist of the performance of office and nonmanual work

8   directly related to the management policies or general

9   business operations of the USPS or USPS customers.

10           As a fact-finding and investigative agent, the

11  appellant investigates postal offenses and civil matters

12  relating directly to the Postal Service.  The appellant

13  customarily and regularly exercises discretion and

14  independent judgment in other than a purely nonconfidential,

15  clerical capacity.  The paragraph continues with matters

16  with regard to labor affiliations and so on that's not

17  relevant.

18           In order to qualify for the administrative

19  exemption, an individual cannot be one who is a non-office

20  manual employee.  I find that postal inspectors are not

21  manual employees and they are not non-office employees.

22           From time to time the postal inspectors engage in

23  physical activities such as arresting individuals or

24  engaging in chases.  The record establishes that these

25  instances of high physical activity occur rarely and fairly

1    infrequently and vary from duty assignment to duty

2    assignment.  An individual is probably likely to make more

3    arrests if he is on a detail considering external crimes

4    than he is in other types of duties.

5            The activities of a level 13 postal inspector are

6    not manual in the sense that they carry out repetitive

7    manual activities or any other form of repetitive activity.

8    The record establishes that while the time in office may

9    vary, postal inspectors spend a substantial amount of time

10   in their offices, depending on the particular type of team

11   to which they are assigned.  That can run from 50 to

12   80 percent.  The record has established that each postal

13   inspector in fact has an office and carries out substantial

14   duties in the office.

15           To the extent that the postal inspector carries

16   out physical activities which themselves could not be

17   characterized as part of the administrative exemption, I

18   find that such activities are directly related to and in

19   furtherance of the activities covered by the administrative

20   exemption.  I find that such activities to the extent that

21   they are not covered would be within the ambit of 29 CFR

22   541.703(a).

23           I acknowledge that the application form and the

24   job description for a postal inspector stressed an

25   individual must be physically capable, in good health, and

1   being able to engage in physical activity for a sustained

2   period and in a variety of harsh environments.  This does

3   not detract from my conclusion that -- and those would be

4   found in Exhibits 272 and 273.  This does not detract from

5   my conclusion that the postal inspectors are not manual,

6   non-office workers.

7          I find that the postal inspectors engage in

8   matters of importance to the Postal Service generally.  A

9   number of major undertakings -- well, first of all, the

10  general nature of their duties is of importance to the

11  Postal Service.  Their jobs focus on maintaining the

12  integrity of the mail system, safety for postal employees

13  and customers, safety for the revenue activities of the

14  Postal Service including preventing any loss of revenue

15  through failure to pay or other noncompliance with the

16  postal regulations.  They also respond to complaints from

17  the public.

18         I find that these generic activities are important

19  to the Postal Service and that they are matters of

20  significance.  The record establishes a number of

21  assignments that are reflective of the degree of

22  significance which the postal inspectors' activities entail.

23  There is testimony with regard to the suggestion to cut down

24  on mail fraud by adopting an 800 verification system that

25  was recommended by one of the postal inspectors.

1          The postal inspectors through their fraud and

2    revenue activities recover substantial sums of money.  In

3    closing argument counsel for plaintiffs conceded that those

4    sums run into the hundreds of thousands if not millions of

5    dollars.  In the activities of Mr. Nigg himself, we see some

6    significant revenue recovery.  With regard to Mastersort, he

7    saved the Postal Service $20 million.  With regard to

8    Carter, he saved $500,000.  There was also a substantial

9    savings with Acortech, and $2.5 million was recovered from

10   Southern California Edison.

11         The protection of the revenue stream of the Postal

12   Service is an important part of its activities, and in a

13   concrete and palpable way postal inspectors generally and

14   Mr. Nigg in particular have contributed to that activity.

15         Other examples of significant revenue activity and

16   issues with which postal inspectors deal, Mr. Milarski

17   testified to $110 million in losses that would be the focus

18   of postal inspector activities in fiscal 2010.  He does that

19   at paragraph 21 of his declaration.

20         Mr. Brooks testified to saving the Postal Service

21   $750,000 as a result of two weeks of activity in San Diego.

22   That's at the Brooks declaration, paragraph 25.

23         I find that the duty of the postal inspector, the

24   primary duty, is conducting complex criminal investigations.

25   I find that that activity requires discretion and

1   independent judgment, and I have suggested a number of ways

2   in which the analytic skills are brought to bear and the

3   decision-making choices and analysis are carried out.

4          Those constitute my findings of fact with respect

5   to the activities of the postal inspectors.  I find that the

6   primary -- for conclusions of law I state:  The primary job

7   of a postal inspector is the conduct of complex criminal

8   investigations.  I find that the activities entail the

9   exercise of discretion, specifically discretion as defined

10  within the regs.  I find that the activities entail the

11  exercise of independent judgment specifically as defined

12  within the regs.  I find that they are not manual-worker,

13  non-office employees.

14         Accordingly, I find that the Postal Service

15  entitled to the application of the administrative exemption

16  under Section 213(a).

17         I further find that in the exercise of discretion

18  and independent judgment, they do so in the context of

19  matters which are significant to the Postal Service in the

20  context specifically of Section 541.202(a) of the regs.  As

21  a footnote -- I guess I mentioned this.

22         I turn now to the highly-compensated exemption

23  which is found at 29 CFR 541.601.  Subparagraph (a) states:

24  An employee with total annual compensation of at least

25  $100,000 is deemed exempt under Section 13(a)(1) of the act

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    if the employee customarily and regularly performs any one

2    or more of the exempt duties or responsibilities of an

3    executive, administrative, or professional employee

4    identified in subparts (b), (c), or (d).

5          Subpart (b) begins with section 541.200, which

6    treats the administrative exemption.  As I have found, the

7    Postal Service is entitled to the administrative exemption.

8    For that reason the highly-compensated employee exemption

9    applies.

10         Even if my analysis is incorrect that all of the

11   requirements of the administrative exemption are met, I

12   nevertheless find that postal inspectors customarily and

13   regularly perform one or more exempt duties.  I find that

14   such activities include principally their investigatory

15   work, their writing of reports, and other activities which I

16   have described as entailing discretion and the exercise of

17   independent judgment.

18         Said another way, the physical activities of the

19   postal inspectors are customarily performed but not

20   regularly performed.  They have to be ready to perform those

21   duties, but I don't believe that they qualify as

22   regularly-performed duties.  In any event there are

23   activities clearly falling within the administrative

24   exemption that they do customarily and regularly perform.

25         Plaintiffs invite me to deny the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  highly-compensated exemption on the basis of the carve-out

2  in Section 541.601(d).  I have already found that postal

3  inspectors are not non-office, manual workers and therefore

4  the carve-out does not apply.

5        On this record it cannot be said that each and

6  every postal inspector is covered by the highly-compensated

7  employee exemption.  At paragraph 7 of her declaration

8  Ms. Belanger simply says that the majority are covered.  If

9  we were to continue with this litigation to a second phase

10  dealing with damages, it would be an issue of proof as to

11  whether any or all of the postal inspectors had a year or

12  years in which they did not meet the $100,000 threshold.

13        So with respect to the exemption, I find as a

14  matter of conclusion of law that the Postal Service has

15  established its entitlement to the highly-compensated

16  employee exemption.  I find that the carve-out in 601(d)

17  does not apply.  I find that a further determination as to

18  whether there are individuals who do not meet the $100,000

19  threshold is an open question that would be litigated in a

20  second phase dealing with damages.

21        I turn to the last topic, which is the good-faith

22  exception.  The good-faith exception is found in 29 USC

23  Section 259, and 29 USC 259(a) provides:  Any action or

24  proceeding based on any act or omission on or after May 14,

25  1947.  No employer shall be subject to any liability or

1  punishment for or on account of the failure of the employer

2  to pay minimum wages or overtime compensation under the Fair

3  Labor Standards Act of 1938 as amended.

4          The Walsh-Healey Act or the Bacon-Davis Act.  If

5  he pleads and proves that the act or omission complained of

6  was in good-faith conformity with and in the reliance on any

7  written administrative regulation, order, ruling, approval,

8  or interpretation of the agency of the United States

9  specified in Subsection (b) of this section, or any

10  administrative practice or enforcement policy of such agency

11  with respect to the class of employers to which he belonged,

12  such a defense if established shall be a bar to the action

13  or proceeding, notwithstanding that after such action or

14  omission such administrative regulation, order or ruling,

15  approval, interpretation, practice, or enforcement policy is

16  modified or rescinded and is determined by judicial

17  authority to be invalid or of no legal effect.

18          In Section 790.15 and in other surrounding

19  sections, the Department of Labor provides additional

20  content for the good-faith defense.  Section 790.15(a)

21  establishes that good faith requires that the employer have

22  honesty of intention and no knowledge of circumstances which

23  ought to put him on notice of an inquiry.  The regulation

24  also makes clear that both objective and subjective good

25  faith is required.

1              On November 8, 1976, the chief postal inspector

2    wrote to the administrator of the Wage and Hour Division,

3    United States Department of Labor, seeking an exemption

4    under the Fair Labor Standards Act for the payment of

5    overtime.  That letter appears at pages -- it appears in

6    Exhibit 117.  It's the first four pages of Exhibit 117.

7              The letter begins:  In accordance with previous

8    discussions between representatives of the Postal Service

9    and members of your staff, the following information is

10   provided to confirm the exemption of postal inspectors from

11   the overtime pay provisions of the Fair Labor Standards Act

12   as amended based upon Section 13(a)(1) of the Act, and 29

13   CFR 541, which establishes the criteria for administrative

14   employees.

15             The letter clearly put before the administrator

16   the precise question that's raised here; that is, whether

17   the activities of postal inspectors are exempt under the

18   administrative exemption.

19             The copy I have of the reply from the Department

20   of Labor seems to indicate that the reply was made in

21   December of 1976.  It appears as pages 4 and 5 of Exhibit

22   117.  The reply states in part:  Based on our review of the

23   information submitted, it is our view that the postal

24   inspectors, all of whom meet the upset salary test in

25   Section 541.2(e)(2) of the basic test's guarantee of at

1    least $250 per week, would qualify as exempt administrative

2    employees under the special proviso for high-standard

3    administrative employees as discussed in explanatory

4    materials found in Section 541.214 of the regulations.  Such

5    employees appear to have as their primary duty the

6    performance of work directly related to the general business

7    operation of the employer, including the exercise of

8    discretion and judgment.

9         In 29 CFR Section 790.17(d), the Department of

10   Labor gives specific content to the concept of a ruling.

11   The term "ruling" refers to an interpretation made by an

12   agency as a consequence of individual requests for rulings

13   upon particular questions.  Opinion letters of an agency

14   expressing opinions as to the application of law to

15   particular facts presented by specific inquiries fall within

16   this description.

17        The letter from the Postal Inspection Service on

18   November 8, 1976, in Exhibit 117, constitutes a ruling

19   within the meaning of regulations.  There is testimony to

20   the effect that the regulation -- that the 1976 letter has

21   never been rescinded or revoked.  I believe that to be the

22   fact on this record.

23        The question then is:  What's the effect of that

24   1976 opinion letter?  We have the opinion, detailed opinion,

25   with regard to the good-faith defense from Tammy McCutchen.

1    I give particularly heavy weight to her opinion because she

2    served as the head of the Wage and Hour Division from 2001

3    to 2004.  She was personally involved in drafting opinion

4    letters of the type that are reflected in Exhibit 117.  Her

5    declaration demonstrates a high degree of knowledge and

6    expertise in the operation of not only opinion letters but

7    in the operation of the administrative exemption as well.

8         To go back to the administrative exemption, I rely

9    in part upon her opinions that the postal inspectors qualify

10   for the administrative exemptions, and in part some of the

11   detail I have recited is reflected in her declaration.

12        I find that this record establishes that the

13   Postal Service has relied upon the letter in its decision

14   not to pay overtime to postal inspectors.  Number one, it

15   solicited the opinion, and its conduct is consistent with

16   the opinion from 1976 to date.

17        Two, on at least two occasions the Postal Service

18   litigated the enforceability and applicability of the

19   opinion.  That's reflected in Dymond, D-y-m-o-n-d, versus

20   United States Postal Service, 670 F.2d 93, Eighth Circuit

21   1982; and Sprague versus United States, 667 F.2d 865, Court

22   of Claims 1982.  It is explicitly evident at least as far as

23   1982 that the Postal Service relied upon the letter and

24   received favorable rulings in each of those cases that the

25   letter was valid.

1        We have the testimony of Mr. Milarski at paragraph

2    25 of his declaration which states in part:  To the best of

3    my knowledge and based upon my review of records kept in the

4    official course of business of the Postal Service, the

5    Postal Service has relied in good faith on the Department of

6    Labor's 1976 opinion letter in classifying postal inspectors

7    as FLSA exempt.  In conformity with this ruling by the

8    Department of Labor, the Postal Service has never paid

9    postal inspectors FLSA overtime.

10        While that paragraph is brief, it is consistent

11   with the practice.  I note that he was not cross-examined on

12   that opinion.  I note his statement on the good-faith

13   element, but I make my judgment not on the blanket statement

14   there but rather on the facts as I analyze them as to the

15   element of good faith.

16        I find that no event occurring subsequent to the

17   issuance of the letter would have caused a reasonable person

18   to doubt the continued applicability of the opinion letter.

19   The first event to consider is the 1996 transfer of the

20   auditing functions to the Office of the Inspector General,

21   the OIG.  Mr. Wiley expressed the opinion -- plaintiff's

22   expert who had been a district director for the Department

23   of Labor in east Los Angeles -- that once one of the three

24   specified functions in the opinion letter were no longer

25   performed, that the opinion letter was no longer valid.

1          He provided no analysis of what percentage at any

2    point in time audit function constituted of the duties of

3    the postal inspectors.  He provided no estimate of how many

4    folks performed audit duties.  He provided no comment as to

5    the interchangeability and cross-training of individuals who

6    performed audit duties to perform other duties and vice

7    versa.  I give that opinion no weight.

8          I do credit two of his opinions.  He said that the

9    letter, the opinion letter, could be relied upon on its

10   face.  And so long as it expressed the conclusion that the

11   activities of the postal inspectors were exempt, the

12   recipient could fairly rely upon that.  He also said that

13   the letter did not depend upon the analysis engaged in or

14   not engaged in by the Department of Labor in issuing the

15   letter, and he specifically noted that it was not dependent

16   on whether they conducted an investigation or not.

17         As to the effect of the transfer, we had what I

18   regard as highly pertinent testimony from Mr. Thomas

19   Van der Merlen.  Mr. Van der Merlen described in some detail

20   the types of activities performed by auditors within the

21   Postal Inspection Service.  His description made fairly

22   clear that they have little, if any, independent judgment or

23   discretion in undertaking audits.

24         An audit plan was developed by management, and the

25   inspector executed the plan.  The plans were designed such

1    that the answer would be the same regardless of what

2    competent individual carried out the audit.  To me that's an

3    activity that has no independent judgment and no discretion,

4    although it may require skill.

5          It may be that any reports that those auditors

6    made on the basis of the audits would qualify as an

7    administrative activity, but the carrying out of the audits

8    themselves did not.

9          The testimony is that approximately 20 percent of

10   the postal inspectors at the time of the transfer performed

11   audit duties.  Mr. Belz testifies as to that in paragraphs

12   41 and 46 of his declaration.

13         We also have testimony that at the time many of

14   the individuals who were performing audit duties were

15   transferred to other duties within the Postal Service.

16   Mr. Miskanic notes that in paragraph 55.  He also notes at

17   paragraph 26 that for the vast majority of postal

18   inspectors, their duties did not change as a result of the

19   transfer of the audit function.  Mr. Belz also makes the

20   same point in paragraph 28 of his declaration.

21         I conclude that, if anything, after the transfer

22   of the audit functions postal inspectors as a group had

23   increased discretion and increased opportunity to exercise

24   independent judgment by the elimination of activities which

25   clearly entailed neither of those.

141

1          A review of the descriptions of the job of postal

2     inspector indicates that the job descriptions have remained

3     principally the same.  If one reads seriatim Exhibit 208, a

4     1972 description, Exhibit 210, a 1989 description, Exhibit

5     211, a 1991 description, and Exhibit 242, a 2002

6     description, you see in each of those that the principal

7     function of a postal inspector is to conduct complex

8     criminal investigations.

9          The one thing that does change is that by 2002 you

10     no longer see reference to the audit function.  I conclude

11     that the elimination of the audit function would not have

12     put a personal -- a reasonable person on notice that facts

13     had changed undermining the applicability of the original

14     1976 exemption.

15          Ms. McCutchen comes to the same conclusion.  She

16     notes that the investigative activities were the same

17     although the focus of some of those activities changed

18     specifically with regard to the elimination of audit

19     activities.

20          It is clear that the service conducted reviews of

21     job -- the nature of jobs periodically subsequent to 1976.

22     Ms. McCutchen testifies to reviews that were conducted in

23     1989, 1991, 2002, and 2006.

24          It is clear that the Postal Service did not cast a

25     blind eye to the obligation to review the descriptions and

1   activities to ensure continued compliance with the Fair

2   Labor Standards Act.  In 2004 a general review was conducted

3   of all job descriptions.  That's discussed in Ms. Goldman's

4   declaration at paragraphs 7 to 10.

5           Some changes in designations were made, including

6   at least one within the Postal Service with regard to an

7   analyst, which is reflected in Exhibit 263, page 2.  So I

8   find that nothing in the transfer of activities to the OIG

9   would have caused a reasonable person to conclude that a new

10   analysis was necessary.  To the contrary, the basic

11   activities of postal inspectors remained the same before and

12   after that transfer to today.

13           Plaintiffs suggest that the Postal Service should

14   be put on notice by a change in law in 2004; namely, the

15   adoption of the regulation at 29 CFR 541.3(b).  I have

16   indicated my reasons in the summary judgment motion why

17   that -- why the adoption of that regulation didn't change

18   the analysis.  Given that, it seems to me unreasonable to

19   expect the Postal Service to be on notice of change

20   circumstances where the Court has held that there was none.

21   Moreover, in the analysis the Court did earlier, the Court

22   concluded that at least with respect to postal inspectors,

23   regulation 541.3(b) did not amount to a change.

24           The Postal Service has the burden on the

25   good-faith defense, and I find as a factual matter that it

1    has carried that burden and has shown by a preponderance of

2    the evidence that there was an opinion letter falling within

3    the context of Section 259 that was valid when issued and

4    continued in full force and effect.  And they have also

5    shown by a preponderance of the evidence that the Postal

6    Service relied upon that letter and that the Postal Service

7    acted in good faith.

8          I make the following -- I adopt the following

9    conclusions of law:  For purposes of 29 USC Section 259, the

10   1976 opinion reflected in Exhibit 117 is a valid basis for a

11   good-faith defense.  The letter itself falls within the

12   ambit of 29 CFR 790.17(d).  I find that the Postal Service

13   relied in good faith on that letter.  I find that no event

14   including without limitation the 1996 transfer of functions

15   to the OIG or the 2004 regulation constituted a change in

16   circumstances which would have put a reasonable person on

17   notice that the 1976 letter was inapplicable.

18         I find that 29 USC Section 259 constitutes a

19   complete defense to the claims for overtime pay asserted by

20   the plaintiffs in this action.

21         One further finding with respect to any change

22   circumstances.  I specifically find that Mr. Nigg's

23   administrative challenge wasn't sufficient to put the Postal

24   Service on notice that the 1976 letter was valid.  He simply

25   challenged that letter, and I don't think the challenge in

1   and of itself is sufficient to put the Postal Service on

2   notice that the 1976 letter was no longer valid.

3           Again with respect to the good-faith defense

4   analysis, I place substantial weight on the opinions of

5   Ms. McCutchen.

6           I have announced separately my findings of fact

7   and conclusions of law with respect to the three issues

8   remaining.  If any finding of fact should be deemed a

9   conclusion of law, I so deem it.  If any conclusion of law

10  should be deemed a finding of fact, I so deem it.

11          The Postal Service is directed to submit a form of

12  judgment within 10 days.  If the proposed judgment is

13  subscribed as to form, I will enter it immediately.

14  Otherwise I will wait ten days for any objections as to the

15  form of the judgment.

16          Anything further?

17          MR. OSBORN:  I don't believe so, Your Honor.  I

18  would like to thank you for treating us professionally and

19  courteously and thank you on behalf of my clients.  We very

20  much appreciate your allowing us to conclude the entire

21  trial so that if we do pursue this matter, we're able to do

22  it in one swoop.  So thank you, Your Honor.

23          THE COURT:  Well, I believe that the proceedings

24  have given you a full and complete record to present your

25  case to the Ninth Circuit.  I realize that the way I do

1  bench trials is labor-intensive for counsel, and I
2  appreciate the substantial work that the parties engaged in.
3  I think that one of the real benefits to the parties is if I
4  do my homework and prepare myself, I am able to master at
5  least to the best of my ability the law and the facts and to
6  render a decision.
7        I will confess to you that one of my failings as a
8  judge is to resolve bench trials in a timely manner, so this
9  means of doing it enables me to do so in a prompt fashion.
10  And I think my oral recitation fully reflects my extended
11  thought on the issues in the case.  So I thank you for that
12  work.  It's very much appreciated.
13        MR. OSBORN:  Thank you, Judge.
14        THE COURT:  Mr. Axe.
15        MR. AXE:  Your Honor, we do thank you for your
16  time.  In the Court's oral recitation I made a couple of
17  quick notes.  I am not sure if they were misstatements, but
18  I just wanted to bring them to the Court's quick attention.
19        THE COURT:  I was going to ask if anybody invites
20  any further findings or conclusions.
21        MR. AXE:  In the significance section Your Honor
22  referenced the declaration of Mr. Milarski regarding money
23  saved, but I believe it was Mr. Miskanic.
24        THE COURT:  Okay.
25        MR. AXE:  So I noted that for the Court.  There is

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    a description of a finding that the Court was going to enter

2    that the work of postal inspectors was not manual and not

3    non-office.  We would also request that the Court enter a

4    finding consistent with the language in 541.200 that the

5    primary duty of postal inspectors is the performance of

6    office or nonmanual work -- and the rest of that sentence.

7           THE COURT:  In describing their primary duties as

8    investigating complex criminal matters, in that context

9    their work is nonmanual and office.

10          MR. AXE:  Correct, Your Honor.  That's the finding

11   that we are looking for.

12          And in the good-faith section of the discussion, I

13   believe the Court characterized the opinion letter as the

14   November 1976 letter.  I think it's the December 1976

15   letter.  The November letter was the request letter.

16          THE COURT:  It appears to say December, but you're

17   correct.  It's not November, but it's the letter in Exhibit

18   117.  The government's practice at least at this period was

19   to use a stamp to date the correspondence so that it didn't

20   sit around with a stale date.  But the consequence is that

21   it never xeroxes very well.

22          MR. AXE:  I think that there is a reference in one

23   of the other cases -- Sprague or Dymond -- confirming the

24   dates.

25          And then the last note I had was during the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  discussion the Court made about the change of the position

2  classifications, the Court said at least one position within

3  the Postal Service.

4           THE COURT:  Postal Inspection Service.

5           MR. AXE:  I believe that's what the Court meant.

6           THE COURT:  That's Exhibit -- I believe it's 263.

7           MR. AXE:  Yes.  Thank you.  That was all I had.

8           THE COURT:  Again, thank you.  This case has been

9  well presented.  I know it's important to both sides, so I

10 wish you well on your way to the Ninth Circuit.

11          MR. OSBORN:  Thank you, Your Honor.

12          MR. AXE:  Thank you, Your Honor.

13          MR. BEINS:  Thank you, Your Honor.

14          MS. HULL:  Thank you, Your Honor.

15          MS. LEE:  Thank you, Your Honor.

16          (Whereupon, the proceedings were concluded.)

17                    *    *    *

18

19

20

21

22

23

24

25

1

2

3

4

5                                    CERTIFICATE

6

7            **I hereby certify that pursuant to Section 753,**

8     **Title 28, United States Code, the foregoing is a true and**

9     **correct transcript of the stenographically reported**

10    **proceedings held in the above-entitled matter and that the**

11    **transcript page format is in conformance with the**

12    **regulations of the Judicial Conference of the United States.**

13

14    **Date:  April 19, 2012**

15

16

17                        **/S/ Sharon A. Seffens 4/19/12**
                        _____

18                        **SHARON A. SEFFENS, U.S. COURT REPORTER**

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER